# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76011-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| TYREE WILLIAM JEFFERSON, | ) | |
| | ) | PUBLISHED OPINION |
| Appellant. | ) | |
| | ) | FILED: July 17, 2017 |

MANN, J. — Tyree Jefferson appeals his conviction for attempted first degree murder, first degree assault, and unlawful possession of a firearm. Jefferson raises ten issues on appeal, including: (1) the trial court erred in denying his Batson[1] challenge after the State used a peremptory challenge to strike the only African American venireperson, (2) the trial court violated the appearance of fairness doctrine, (3) the trial court erred in denying a mistrial for jury misconduct, (4) the trial court erred in admitting gang evidence, (5) the trial court erred in excluding evidence and testimony from one of Jefferson's witnesses, (6) prosecutorial misconduct, (7) that insufficient evidence supported the convictions, (8) the "to convict" instruction was inadequate, (9) ineffective counsel, and (10) cumulative error. Finding no error, we affirm.

---

[1] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

## FACTS

On February 14, 2013, Harmony Wortham and Lashonda Goodman went to Latitude 84, a Tacoma nightclub. At Latitude 84, Wortham and Goodman met an acquaintance Dimitri Powell and Powell's younger relative, Tyree Jefferson.

Over the course of the evening, a dispute arose between Goodman and Rosendo Robinson, another bar patron, over Goodman's sunglasses. Eventually, Goodman and Wortham were kicked out of Latitude 84, and the police arrived. The police interviewed Goodman and Wortham, but did not resolve the dispute over Goodman's sunglasses.

After the police left, Goodman and one of Robinson's female friends, Jessica Hunter, agreed to settle the dispute with a fight. Goodman, Wortham, and Robinson met at the Union 76 gas station across the street from Latitude 84 to fight. Powell and Jefferson also arrived at the gas station. The Union 76 surveillance cameras captured many of the events. The cameras showed Goodman and Wortham confronting and punching Robinson through his car's driver's side window. Robinson stepped out of his car to confront Goodman. And as he did so, Powell and Jefferson got out of a black Nissan Altima and approached. While Powell got into a physical altercation with Robinson, Jefferson walked back to the black car, opened the trunk, pulled out an object, and then ran toward Robinson with his arm outstretched holding a dark item. Surveillance camera 10 showed Jefferson chasing Robinson and Robinson fleeing from Jefferson into the street. After Robinson fled, Jefferson ran back to Powell's car. Moments later, the cars at the Union 76 station sped off.

-2-

Robinson was struck by bullets at the gas station and as he fled on foot across the street. He sustained five gunshot wounds to the torso. Robinson initially identified Powell as the shooter, but after watching the videos, he changed his mind and believed that Jefferson shot him. Wortham, Goodman, and Hunter identified Jefferson as the shooter.

On July 12, 2013, Jefferson was charged with one count of first degree assault by alternative means and one count of unlawful first degree possession of a firearm. The charges were subsequently amended to add one count of attempted first degree murder.

The trial began with jury selection on May 4, 2014. Jury deliberations began on May 20, 2015. The jury convicted Jefferson of (1) attempted first degree murder, (2) first degree assault, and (3) unlawful possession of a firearm in the first degree. Jefferson was sentenced to a low-end standard range sentence of 277.5 months in prison plus 60 months additional for the firearm sentence enhancement.

Jefferson appeals his conviction.

## ANALYSIS

### I

Jefferson argues first that the trial court erred in denying his Batson challenge after the State used a peremptory challenge to strike the only African American venireperson in his jury pool. Jefferson claims the peremptory strike was clearly racially motivated in violation of the equal protection guaranty described in Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We disagree.

We review a Batson challenge for clear error, deferring to the trial court to the extent its rulings are factual. State v. Saintcalle, 178 Wn.2d 34, 41, 309 P.3d 326 (2013). "Clear error exists when the court is left with a definite and firm conviction that a mistake has been committed." Saintcalle, 178 Wn.2d at 41. "Deference to trial court findings is critically important in Batson cases because the trial court is much better positioned than an appellate court to examine the circumstances surrounding the challenge." Saintcalle, 178 Wn.2d at 56.

The equal protection clause of the Fourteenth Amendment prohibits racial discrimination during the jury selection process. "Those on the venire must be 'indifferently chosen,' to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'" Batson, 476 U.S. at 86-87 (quoting Strauder v. West Virginia, 100 U.S. 303, 309, 25 L. Ed 664 (1879)).

Batson established a three-step analysis to determine whether a prosecutor's peremptory strike unconstitutionally discriminates on the basis of race. First, the person challenging the peremptory must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. Second, the "'burden shifts to the State to come forward with a [race-]neutral explanation' for the challenge." Saintcalle, 178 Wn.2d at 42 (quoting Batson, 476 U.S. at 97) (alterations in original). Finally, "'the trial court then [has] the duty to determine if the defendant has established purposeful discrimination.'" Saintcalle, 178 Wn.2d at 42 (quoting Batson, 476 U.S. at 98). Under this "purposeful discrimination" part of the Batson analysis, courts must

examine whether the race-neutral explanation could apply just as well to a nonminority juror who was allowed to serve. Saintcalle, 178 Wn.2d at 43.

During voir dire, the State exercised a peremptorily challenge against juror 10— the last African American person from the venire. Jefferson, an African American, challenged this strike with a Batson motion. The trial court, walking through the three-step Batson analysis, concluded first that Jefferson had established a prima facie showing of racial discrimination. The trial court then shifted the burden to the State by asking the State to explain the reason why it struck juror 10. The State explained that three of juror 10's responses were concerning. First, juror 10 stated that he thought the voir dire questioning was a "waste of time." Second, juror 10 admitted that he previously brought extraneous evidence into the deliberations while serving as a juror in a criminal trial. And third, juror 10 enthusiastically described, in detail, the movie 12 Angry Men.

The trial court considered the State's explanation and concluded that the State had met its burden of producing a nondiscriminatory explanation for its challenge. The court then turned to the third step of the Batson analysis and concluded that that Jefferson had not established purposeful discrimination. Giving due deference to the trial court, its decision was not clearly erroneous.

At least two of juror 10's responses support the trial court's decision to deny Jefferson's Batson challenge. First, juror 10 stated voir dire was a "waste of time." Striking a juror who indicates that the voir dire and pretrial proceedings are a "waste of time" is a reasonable, race-neutral reason to strike a juror. Second, juror 10 admitted

that while serving as a juror in a criminal trial he brought extraneous evidence into the deliberations. This is also a reasonable race-neutral reason to strike a juror.

Jefferson argues that the State's reasons for striking juror 10 were pretexts for a race based strike. First, he claims that juror 1 also believed that voir dire was a waste of time. To support his claim, Jefferson cites to his defense counsel's argument, not juror 1's alleged statement. Juror 1 never said that voir dire was a waste of time. Second, Jefferson claims that although other jurors discussed 12 Angry Men, the State only struck juror 10. This claim also fails, however, because juror 9 was also enthusiastic about the move and was challenged. Jefferson cannot establish that the trial court's decision to deny his Batson motion was clear error.

While we find no error, we are concerned with what appears to be the State's primary argument on appeal. The State repeatedly, in both its briefing before this court, and during oral argument, argued that we should affirm the trial court's denial of Jefferson's Batson motion because of "the circumstances evident to the trial court." Specifically, that "(1) the case was being tried before an African American judge, (2) the prosecutor was African American . . . , (3) the defendant was African American, and (4) the defense attorney was a Caucasian woman." The State argues:

> [I]n essence, the defense attorney's objection amounted to this: the African American prosecutor chose this particular case to attempt to engage in purposeful race discrimination against an African American venire member. Even more implausibly he did so allegedly against a venire member who shared both his and the judge's racial background.[2]

---

2 Br. of Resp't. at 14.

In essence, the State invites us to accept the proposition that where the prosecutor is an African American or other minority, we should presume that there was no purposeful discrimination in the peremptory challenge. The State's argument lacks merit, is inappropriate, and has no bearing on a Batson analysis. Neither the race or gender of the judge hearing the case, nor the race or gender of the lawyers trying the case, are relevant inquiries under Batson. Once a prima facie showing of discrimination is made, the State must provide a race-neutral explanation for the peremptory challenge and the trial court must then conduct a comparative juror analysis to determine if there was purposeful discrimination. Saintcalle, 178 Wn.2d at 42-43. The court's focus is on the jurors, not the race or gender of the judge or lawyers.

## II

Jefferson next contends that a series of actions, statements, and rulings made by the trial court demonstrate a violation of the appearance of fairness doctrine. After reviewing the record, we disagree.

"Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." State v. Gamble, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). "'The law goes farther than requiring an impartial judge; it also requires that the judge appear to be impartial.'" Gamble, 168 Wn.2d at 186 (quoting State v. Madry, 8 Wn. App. 61, 70, 504 P.2d 1156 (1972)). "Evidence of a judge's actual or potential bias must be shown before an appearance of fairness claim will succeed." State v. Chamberlin, 161 Wn.2d 30, 37, 162 P.3d 389 (2007). Under the Code of Judicial Conduct (CJC), designed to provide guidance for judges, "[j]udges should disqualify

themselves in a proceeding in which their impartiality might reasonably be questioned." CJC Canon 3(D)(1); Gamble, 168 Wn.2d at 188.

Jefferson raises several examples of the trial court's bias against him. We address each in turn.

A.   Jury Appreciation Day

First, at the end of the first day of trial, the court informed the jurors that the county council was making a proclamation for Juror Appreciation Month and "you are certainly welcome to join me on the 10th floor, in council chambers, at 3:15 if you'd like to do that. It might be nice for them to see some real folks, but I'll leave that to your discretion." Jefferson did not object. When the jury appeared the next morning, the court stated that "after court, I ran into one of your colleagues on the tenth floor, and the person got to meet the county council and—for our Juror Appreciation day, and it was really interesting. I don't think some of the council, some of the members, had seen a real juror before. It's like he became a celebrity."

Jefferson argues that the court's comments demonstrate bias. We disagree. A reasonably prudent, disinterested observer would not conclude that the court was biased or appeared biased by extending an invitation for the jurors to attend a juror appreciation event.

B.   Admonition of Defense Counsel

Second, Jefferson cites two instances where the trial court admonished defense counsel's conduct. The first instance concerned the State's witness, Wortham. Wortham had been flown up from California under subpoena. Wortham's testimony, which turned out to be hostile to the State, was started late on a Thursday, but was not

completed before the end of the trial day. The State asked the court to instruct the witness to return Monday morning. Defense counsel interrupted and inserted that Wortham had not legally been subpoenaed. This apparently surprised Wortham. The court instructed Wortham to return on Monday and not to talk to anyone about the case or her testimony.

On Monday morning, the State requested a bench warrant after learning that Wortham had changed her flight and was on her way to the airport. The court issued the bench warrant and then asked both trial counsel if they had been in contact with Wortham over the weekend. Defense counsel stated that Wortham called her to ask about the subpoena. Counsel stated that she informed Wortham that she could not give legal advice and that Wortham should talk to a lawyer. Counsel did, however, provide Wortham with a citation to RCW 10.55.060, the statute controlling out of state subpoenas. The trial court expressed its concern:

> I'm going to tell you, I'm concerned about that the statue even came up. . . Nobody has brought anything to my attention that is improper about the way she was summosed . . . But at this point, I have to tell you candidly, I don't think it excuses any discussion about 10.55.060 and anything that suggests to her that she maybe didn't have to show today, or there was some technicality for her to get out of it following this court's order, is a serious problem, in my view, and I'm going to research it further.[3]

The jury was not present during this discussion. It does not appear the trial court took further action.

In the second instance, prior to the testimony of Jefferson's forensics expert, the State objected that it had no information about what the expert was going to testify to as

---

[3] Report of Proceedings (RP) (May 11, 2015) at 534.

it had not received an expert report. The trial court asked if the witness was going to mirror the cross-examination of the State's forensic expert. Defense counsel then stated that the expert "didn't examine evidence. That's why there is no expert report." During the expert's testimony, it was disclosed that he had examined photographs of the victim's clothing before trial and was prepared to testify to his opinions. The trial court dismissed the jury and again admonished defense counsel:

> Ms. Corey, I'm going to raise an issue. And, you know, I got to tell you candidly, at this point, I feel like the Rules of Professional Conduct mean nothing. I'm really concerned about the lack of candor to the Tribunal. I'm concerned about fairness to opposing Counsel. I know this has been contentious. Okay? But I got to tell you, candidly, you led me to believe that Mr. Sweeney's coming here to talk about one thing. Mr. Sweeney has had these photos. I asked you about a report from Mr. Sweeney. Mr. Sweeney did not write a report because he hasn't reviewed any evidence – and I'm paraphrasing. Okay?
> Mr. Sweeney reviewed evidence in April. Mr. Sweeney could have written a report, and now you're asking him to testify about the photos that he looked at back in April, and there has been nothing. There has been nothing.
> [The prosecutor] has been complaining all day about sandbagging. I say, no, this isn't sandbagging. I'm letting him talk about a very limited subject matter. And, no, he didn't write a report because I asked for—I ordered you to provide a report to him. There was no report because he didn't look at anything. Because he didn't consider the evidence. Okay?
> I don't want to hear it, okay? But you can explain it to the WSBA when we're done.[4]

Again, Jefferson cannot demonstrate evidence of the court's actual or potential bias. A reasonably prudent, disinterested observer would not conclude that the trial court's action admonishing defense counsel for unprofessional behavior showed actual or apparent bias. The admonitions occurred twice over a three-week trial. Both instances were outside the presence of the jury. And in both instances, the record

---

[4] RP (May 18, 2015) at 1116-17.

reflects defense counsel's conduct was unprofessional. The court's admonition of defense counsel was appropriate and does not demonstrate bias.

C.    Sua Sponte Objections

Third, Jefferson contends that the trial court made several sua sponte objections during the trial that demonstrate bias against Jefferson or his counsel.  In addition to the admonition of counsel discussed above, Jefferson cites to three incidents over the course of the trial.  First, during cross-examination of one of the investigating officers, Jefferson asked whether the officer had visited the victim in the hospital.  When he replied "no" Jefferson asked if this was because Robinson was uncooperative.  The court interjected and, after a sidebar where the court explained that he was concerned the question would confuse the jury because there was no evidence on direct examination that Robinson had been cooperative, the question was withdrawn.  Later, during direct examination of Jefferson's forensic expert, the trial court interjected after Jefferson asked the expert to draw a hypothetical sketch of a bullet with landings and grooves, and a shell casing with hit fire pin indentation.  During sidebars, the court explained that both drawings would confuse the jury because the expert had not reviewed any of the recovered bullets or casings.  After hearing from counsel, the court allowed the expert to draw the sketch of a bullet but not the casing.

The trial court is generally in the best position to perceive and structure its proceedings.  Accordingly, the trial court has broad discretion to make trial management decisions, ranging from "the mode and order of interrogating witnesses and presenting evidence," to the admissibility of evidence, to provisions for the order and security of the courtroom.  State v. Dye, 178 Wn.2d 541-47, 48, 309 P.3d 1192 (2013).  In each

instance cited by Jefferson, the trial court interjected and called a sidebar. Then later, with the jury out, the court summarized the sidebar, explained its ruling, and allowed counsel to supplement the record. A reasonably prudent, disinterested observer would not conclude that the trial court's action attempting to avoid confusing the jury showed actual or apparent bias.

D.    Courtroom Hostility

Fourth, Jefferson contends that the trial court's admonition of members of the gallery, including Jefferson's father, during the trial demonstrate bias. Jefferson cites several events. For example, after the court concluded its ruling on the Batson challenge, the prosecutor asked the court to "admonish individuals in the courtroom not to make comments directed at the prosecutor, in a way to question or harass the prosecutor." The court warned the gallery that it would hold people in contempt if Jefferson's case was threatened. During the admonition, Jefferson and the trial court exchanged heated remarks. One morning during the second week of trial, prior to the jury entering the courtroom, the prosecutor asked the trial court to admonish Jefferson's father for calling him names. The court asked the sheriff deputy and defense counsel about what had happened. After hearing the exchange, the trial court gave Jefferson's father a second warning. When Jefferson's father continued to argue with the court, the court held him in contempt and had him removed from the courtroom.

That same day, after the mid-day recess and before the jury was brought in, the trial court addressed the parties and the gallery:

> The other thing I want to mention, and with some degree of trepidation, when I am not out here—you know, we had a discussion this morning, and it got into who said what, and people were saying things.

And I just want to remind everyone that civility and professionalism is of paramount importance in this trial, and anything short of that, I just have to be candid, is unacceptable. And, candidly, I'm concerned that whatever is going on, if anything, between counsel, is spilling out onto people in the gallery, and I don't want that to happen. So that's what I want to say.

The other thing is, I don't know if there's been one person here—I don't know if it's Mr. Jefferson's mother, or what, or relative who has been here, I think at all the hearings, and I think she knows how important it is that everybody be civil, that we try to do everything we can to make sure that this is a fair trial and that nobody does anything to interfere with Mr. Jefferson's right to a fair trial. And to the extent that she's—some of the folks in the gallery—been the one with the level head, I appreciate that. And so this is really important to me, and I just wanted to be clear about it.[5]

There is certainly evidence in the record that the atmosphere in the courtroom was heated at times. Outbursts from disgruntled members of the gallery and Jefferson punctuated the proceedings. But far from showing bias, after reviewing the record, it is clear that the trial court's demeanor and restrained, understated approach over the course of the three-week trial was exemplary. A reasonably prudent, disinterested observer would not conclude that the trial court's action managing the trial and courtroom showed actual or apparent bias.

In sum, Jefferson's arguments that the court was biased against him fail. A disinterested observer viewing the entire record would conclude that Jefferson's trial was fair and conducted without apparent or actual bias.

III

Jefferson next contends that the trial court abused its discretion by removing and replacing a juror that had witnessed extrinsic evidence rather than declaring a mistrial. We disagree.

---

5 RP (May 12, 2015) at 736-37.

-13-

A.    Juror Observations and Voir Dire

During the lunch break after the State's closing argument, juror 8 approached the trial court with a question. The court referred the juror to his judicial assistant. After the lunch recess, the trial court moved, sua sponte, to close the courtroom. The court explained that he believed there were compelling reasons under Bone-Club[6] to close the court for a limited time. The court explained that his concern was "based on concern about Mr. Jefferson's right to a fair trial, and I'm concerned that if we aren't able to flesh this out candidly, there is a serious and imminent threat to [Jefferson's] right to a fair trial." There were no objections from the parties or members of the gallery.

With the courtroom closed, the court heard first from the judicial assistant, juror 8, and juror 9. The judicial assistant recounted that juror 8 told him that "she felt threatened, scared, intimidated, something to that effect, yesterday afternoon when court had recessed." The court and parties then questioned juror 8. Juror 8 explained that as she and juror 9 walked to their cars at the end of the day, she observed one of the men from the gallery observing jurors as they were getting in their cars. No contact, words, or gestures were exchanged between the jurors and the gallery members, but juror 8 found it "a little nerve wracking." Juror 8 believed she could continue and evaluate the evidence in a fair and unbiased manner. The court and parties then questioned juror 9. Juror 9 also observed members from the gallery as they left the courthouse but did not observe anyone watching them. She was not bothered until juror 8 brought it to her attention. Juror 9 did not believe the events would impact her ability

---

[6] State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995).

to be fair or impartial. After the voir dire of jurors 8 and 9, the trial court explained that it was not declaring a mistrial.

Defense counsel asked the court to question the remaining jurors. The State objected and expressed concern that if they cross-examine each of the jurors it might result in getting them to "adopt something that's not there" and provide the defense a reason to challenge the juror. The court, initially siding with the State, was afraid to question more jurors for fear of "poison[ing] the water." The court explained that it viewed juror 8 very different than juror 9. It believed juror 8 had an issue, but that juror 9 was not intimidated, frightened, or concerned. Defense counsel agreed and expressed belief that juror 8 should be removed, but that juror 9 was "probably okay." But at defense counsel's suggestion, the court questioned each juror individually.

Although each juror knew something about juror 8's observation, each juror recounted a slightly different version of what juror 8 reported. Every juror confirmed that the incident did not affect his or her ability to be fair and impartial going forward.

Jurors 5 and 11 mentioned that they heard discussion of a "black Nissan" or "black Altima" and that someone might have been watching them. This was concerning because the shooter's car was black. But none of the other jurors mentioned a black Nissan or black Altima. After questioning the entire jury, the court questioned jurors 5 and 11 again. After further argument, the court indicated that it planned to excuse juror 8 and deny the motion for a mistrial. Before denying the motion for a mistrial, the court asked juror 8 if she mentioned anything about a vehicle to the other jurors. She denied doing so.

-15-

After hearing argument, the court excused juror 8 and denied the motion for mistrial. The court "believe[d] that Juror 11 and Juror 5 [could] be fair and impartial. . . . [and that] they [could] follow the Court's instructions."

B.     Impartial Jury

Jefferson argues first that he was denied his right to an impartial jury.

The accused in a criminal trial has a constitutional right to a fair and impartial jury. U.S. Const. amends. VI, XIV § 1; Wash. Const. art I, §§ 3, 22; State v. Brett, 126 Wn.2d 136, 157, 892 P.2d 29 (1995). Where trial irregularities concerning the jury arise, a new trial is warranted only when the defendant "has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly." State v. Bourgeois, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). The decision is a matter left to the discretion of the trial court. State v. Bartholemew, 98 Wn.2d 173, 211, 654 P.2d 110 (1982).

Similarly, we review a ruling on a motion for mistrial for abuse of discretion. See, e.g., State v. Tigano, 63 Wn. App. 336, 342, 818 P.2d 1369 (1991) (reviewing mistrial motion based on jury misconduct for abuse of discretion). "A trial court abuses its discretion when it acts on untenable grounds or its ruling is manifestly unreasonable." State v. Gaines, 194 Wn. App. 892, 896, 380 P.3d 540 (2016). An abuse of discretion occurs "only if no reasonable person would adopt the view espoused by the trial court." State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). "The trial court's ruling, therefore, will not be disturbed unless this court believes that no reasonable judge would have made the same ruling." State v. Thomas, 150 Wn.2d 821, 854, 83 P.3d 970 (2004).

-16-

Misconduct occurs when a jury considers extrinsic evidence. Gaines, 194 Wn. App. at 897. Extrinsic evidence is information outside what is admitted at trial. "This type of evidence is improper because it is not subject to objection, cross-examination, explanation or rebuttal." State v. Pete, 152 Wn.2d 546, 553, 98 P.3d 803 (2004) (internal quotations omitted).

If a potentially prejudicial contact is alleged, the court should "'determine the circumstances, the impact thereof upon the jury, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.'" Tarango v. McDaniel, 837 F.3d 936, 948-49 (9th Cir. 2016) (quoting Remmer v. United States, 347 U.S. 227, 230, 74 S. Ct. 450, 98 L. Ed. 654 (1954)), cert. denied, 137 S. Ct. 1816 (2017).

If the allegations are found to be true, then the "court must determine if the bias or prejudice amounted to a deprivation of Fifth Amendment (due process) or Sixth Amendment (impartial jury) guarantees." United States v. Hendrix, 549 F.2d 1225, 1229 (9th Cir. 1977). A trial court can inquire into the jurors' "subjective ability to disregard extrinsic information before there is a verdict to potentially impeach." Gaines, 194 Wn. App. at 898.

Jefferson argues that juror 8's comment about being intimidated tainted the jury. He relies on three cases: State v. Rinkes, State v. Pete, and Mach v. Stewart. Rinkes held that mistakenly sending a newspaper editorial and cartoon into the jury room constituted prejudicial error. 70 Wn.2d 854, 862-63, 425 P.2d 658 (1967). Pete held that a new trial was required where the court inadvertently sent the jury two unadmitted but admissible written statements: a police officer's report and a defendant's written and signed statement. Pete, 152 Wn.2d at 554-55. And Mach v. Stewart held that Mach's

right to an impartial jury was violated when the venire was exposed to a veniremember's expert-like statements about the veracity of children's claims of sexual abuse. 137 F.3d 630, 634 (9th Cir. 1997).

Unlike in Rinkes, Pete, and Mach, the trial court here opened an investigation into the issue by conducting a voir dire of each juror individually. Because the misconduct came to light before the verdict was rendered, the court and parties had the opportunity to inquire into the jurors' "subjective ability to disregard extrinsic information." Gaines, 194 Wn. App. at 898. The court conducted a full hearing into the matter, confirmed that each juror, except for juror 8, could remain impartial, and satisfied itself that the "black Altima" and "black Nissan" comments were heard out of context.

Part way through the court's voir dire, it considered giving a curative instruction. Jefferson rejected this suggestion:

> I don't think there's a curative instruction that the Court can propose, and I've spent time since the Court went back to do that researching online, whether or not you can give curative instruction in this situation, and I don't know how you can do that. Can you tell the jurors to pay no attention to the statements of your fellow jurors? Put no credence in what your fellow jurors say? Of course you can't do that.
>
> I don't think it's something you can—I don't think the Court can invade that. The—I mean, I think we can hear what went on, but in terms of telling them to—[7]

Given this record, the court's denial of Jefferson's mistrial motion is not manifestly unreasonable. There is no basis to conclude that "no reasonable judge would have made the same ruling." Thomas, 150 Wn.2d at 854.

---

[7] RP (May 19, 2015) at 1265.

-18-

C.   Presumption of Innocence

Jefferson also argues that the jury misconduct destroyed his presumption of innocence. The presumption of innocence "is a basic component of a fair trial under our system of criminal justice." State v. Finch, 137 Wn.2d 792, 844, 975 P.2d 967 (1999) (quoting Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)). To implement the presumption, courts must be alert to factors that may "undermine the fairness of the fact-finding process." Williams, 425 U.S. at 503. "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." Williams, 425 U.S. at 504.

Here, Jefferson's presumption of innocence was not destroyed. The court investigated the jury misconduct thoroughly and determined that each juror (besides juror 8) could remain impartial and that the "black Nissan" and "black Altima" statements were heard out of context. Jefferson's argument that the presumption was lost when the jurors "obtain[ed] information that the shooter car followed jurors" overstates the record. After reviewing the entire record, we are satisfied that the comments about a black car were minor comments that only two jurors thought that they heard. The comments were not, as Jefferson argues, so prejudicial to him that they destroyed his presumption of innocence.

IV

Jefferson argues that the trial court abused its discretion by improperly admitting prejudicial gang evidence under ER 404(b). We disagree.

ER 404(b) prohibits a court from admitting "'[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity

-19-

therewith." "This prohibition encompasses not only prior bad acts and unpopular behavior but also any evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of a crime." State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting State v. Everbodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). We review evidentiary rulings for abuse of discretion. State v. Yarbrough, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." State v. Embry, 171 Wn. App. 714, 731-32, 287 P.3d 648 (2012).

Evidence of gang affiliation is considered prejudicial. Embry, 171 Wn. App at 732 (citing State v. Asaeli, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009) (noting "the inflammatory nature of gang evidence generally")). Gang evidence may not be admitted to prove that the defendant was prone to commit the crimes with which he was charged, but may be admitted for other purposes. Yarbrough, 151 Wn. App. at 81. There must, however, be a "nexus between the crime and the gang before the trial court may find the evidence relevant." Embry, 171 Wn. App. at 732.

Here, in response to a defense motion in limine, and without objection, the trial court confirmed that this was "not a gang case" and was prepared to exclude all gang evidence. The State confirmed that it was not a gang case, but asked to allow witnesses that knew Jefferson by only his moniker—"Little Shake" or "Baby Shake"—be allowed to use the nickname.

After confirming that the State did not plan to put on expert testimony about gang activity, the trial court excluded gang evidence with two caveats: (1) the State must

admonish its witnesses to refer to Jefferson as "Mr. Jefferson," and that (2) Jefferson would not prejudiced by witnesses testifying that they only knew Powell as "Shake" or Jefferson as "Baby Shake." Jefferson did not object.

At trial, references to "Shake Man," "Little Shake," and "Baby Shake" were sparse. Wortham referred to Powell as "Shake Man" once during direct examination. Jefferson did not object. The State admonished Wortham not to refer to Powell as "Shake Man," but as "Dimitri Powell." On the seventh day of trial, the State asked Sesilia Thomas, the manager of Latitude 84, if she knew "Shake Man." Thomas replied that she knew that person. When the State asked Thomas to identify "Powell" in a photo, Jefferson objected "to the form of the question." The court sustained the objection on the ground that Thomas laid a foundation that she knew Shake Man, not that she knew Powell. On the eighth day of trial, Goodman referred to Powell as "Shake Man." After the State referred to "Shake Man" in three other questions, Jefferson objected to the reference. The court sustained the objection. When the State resumed its direct examination of Thomas, the State did not use the nickname again. Later that day, Hunter testified that she knew Powell as "Shake Man," but that she did not know Jefferson by any other name.

The sparse references to "Shake Man" and "Baby Shake" did not violate Jefferson's right to a fair trial. There was no testimony about a street gang, what a street gang was, how a person joins, what membership entails, Jefferson's affiliation to a gang, or how gang membership motivated the crime. The nicknames, to the extent that they were used at trial, did not affiliate Jefferson with any gang or gang activity.

-21-

Jefferson argues that the nicknames have unsavory meanings that may demonstrate gang membership, but Jefferson cannot link the nicknames to a specific gang or gang activity. That the nicknames suggest that Jefferson was Powell's disciple or protégé is not evidence of Jefferson's gang affiliation. As the trial court explained in its pretrial ruling on this matter, "nicknames or street names . . . don't implicate or make this a gang case." Jefferson's claim—that he was denied his right to a fair trial because of improperly admitted gang references—fails.

V

Jefferson argues next that the court violated his constitutional right to present a defense when the court excluded Jefferson's investigator, Patrick Pitt, from testifying at trial and authenticating freeze frame images extracted from the Union 76 station surveillance cameras. We disagree.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). However, a court "'necessarily abuses its discretion by denying a criminal defendant's constitutional rights.'" State v. Iniquez, 167 Wn.2d 273, 280, 217 P.3d 768 (2009) (quoting State v. Perez, 137 Wn. App. 97, 105, 151 P.3d 249 (2007)). "We review an alleged denial of the constitutional right to present a defense de novo." State v. Lizarraga, 191 Wn. App. 530, 551, 364 P.3d 810 (2015); State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

The Sixth Amendment to the United States Constitution and article 1, section 22 amendment 10 of the Washington State Constitution guarantee criminal defendants the right to present testimony in one's defense. State v. Maupin, 128 Wn.2d 918, 924, 913

-22-

P.2d 808 (1996); State v. Wade, 186 Wn. App. 749, 763-64, 346 P.3d 838 (2015). However, the right to present a defense is not absolute—the right does not extend to irrelevant or inadmissible evidence. Wade, 186 Wn. App. at 763-64. The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). The defendant's right to present a defense is subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Cayetano-Jaimes, 190 Wn. App. 286, 296, 359 P.3d 919 (2015).

After the State rested, the court asked for a witness lineup for the defense. Defense counsel indicated that Jefferson planned to call an investigator, Patrick Pitt. When asked to summarize Pitt's anticipated testimony, defense counsel explained that Pitt had looked at the Union 76 surveillance videos and extracted approximately 8 freeze frame images showing Powell. Because the court previously required the State to lay a foundation for personal knowledge before allowing the introduction of the surveillance videos, the State asked that foundation be laid for Pitt's personal knowledge. The court, concerned that Pitt lacked foundation, and that the images were from videos that the court had "seen ad nauseum," requested an offer of proof. The court explained:

> Ms. Corey, here's the issue. Okay? And you probably know this better than anyone in this room because you probably are—have the most experience. Whenever we go to trial like this and the question is not just, is evidence relevant, and balancing the relevance verses the potential prejudice, you know, the issue is how we get it in.

We're at the third week of trial. The videos have not been a surprise to anybody. We all knew that they were there. We all knew what cameras were there, and I believe in almost every other occasion, either a person who actually observed, or operated the camera, or owned the camera, or took the picture, or could provide some basis for what we're seeing, is the one that we introduced the evidence through. And you know better that better than I do. And, in fact, that's why we don't just say, okay, Jury, here's some pictures. Go for it. Figure it out. That's always one of the issues.[8]

The offer of proof revealed that Pitt was not at the Union 76 station on the night of the shooting, did not know how many images he had extracted, and did not know where or which cameras the photos were taken from.

The court excluded Pitt's testimony explaining:

No. 1, the first set is cumulative.
No. 2, Mr. Pitt can't say for sure what camera is what, or what's being depicted.
No. 3, Mr. Pitt can't lay a foundation. He's not a witness with knowledge that the matter is what it claims to be. . . .
And, finally, it's confusing to the jury. What is the jury supposed to do? Look at those pictures and try to ascertain what they mean, what they depict, who is who? And nobody can tell them because Mr. Pitt can't testify to it.
So, finally Mr. Pitt has obviously taken snippets of photos from a video, but he can't tell us whether they're in any sequence; whether we took the first two minutes; or we took this from Minute No. 4, or 5, or 3, or 1; or I got the ones that I thought would look good from the first couple of minutes and then the last minute. We don't know any of that, and nobody can explain that to the jury.
Ms. Corey, you can't because then you'd be a necessary witness. He can't; he doesn't have first-hand knowledge.
So I'm not going to have Mr. Pitt testify, and I'm going to exclude his lately—this evidence that is not timely, it is confusing, it's cumulative, and there's no foundation for [it]. I'll note your objection for the record.[9]

---

[8] RP (May 18, 2015) at 1048-49.
[9] RP (May 18, 2015) at 1053-54.

-24-

We agree that the trial court's decision did not deny Jefferson his Sixth Amendment right to present a defense. The court properly excluded Pitt from testifying for several reasons. First, ER 602 prohibits a witness from testifying about a matter if the witness lacks personal knowledge of the matter. The rule has a low threshold for what constitutes personal knowledge and only requires that evidence "sufficient to support a finding" of personal knowledge be introduced. State v. Vaughn, 101 Wn.2d 604, 611, 682 P.2d 878 (1984). "Testimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge." Vaughn, 101 Wn.2d at 611-12.

Under ER 602, Pitt was not competent to testify because he did not have personal knowledge of the scene or location of the cameras. Pitt admitted that he was not at the scene on the night of the shooting, did not know how many images were at issue, or which camera each image was taken from. As the trial court explained, "there's nothing that precluded the defense from showing the freeze frames to Ms. Wortham, . . . any of the witnesses and saying: What is this? And were you here? And you were here. And what is this?" Pitt, however, was not the right witness. "[N]o trier of fact could reasonably find that the witness had firsthand knowledge." Vaughn, 101 Wn.2d at 611-12.

Second, ER 403 allows a court to exclude relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues, misleading the jury, or needless presentation of cumulative evidence. It is not error to exclude cumulative evidence. Saldivar v. Momah, 145 Wn. App. 365, 396, 186 P.3d 1117 (2008). The trial court reviewed Jefferson's proposed images and determined that they

were cumulative to the videos and freeze frame images already introduced by the State. The images were extracted from videos that had been repeatedly shown during the course of trial. Moreover, Pitt was not prepared to testify which camera the images were extracted from nor the relative timing. As a result, the trial court found Jefferson's proposed images were both cumulative and potentially confusing.

Jefferson's constitutional right to present a defense was not violated.

## VI

Jefferson claims that the court abused its discretion when it denied his motion for a mistrial based on prosecutorial misconduct. We disagree.

We review rulings on allegations of prosecutorial misconduct for an abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). "The defendant bears the burden of showing that the comments were improper and prejudicial." Lindsay, 180 Wn.2d at 431. The prosecutorial misconduct inquiry consists of two prongs: (1) whether the prosecutor's comments were improper and (2) if so, whether the improper comments prejudiced the defendant. Lindsay, 180 Wn.2d at 431. To show prejudice, the petitioner must show a substantial likelihood that the prosecutor's statements affected the jury's verdict. Lindsay, 180 Wn.2d at 440. A prosecutor can "argue that the evidence does not support the defense theory." Russell, 125 Wn.2d at 87. But a prosecutor "must not impugn the role or integrity of defense counsel." Lindsay, 180 Wn.2d at 431-32.

Jefferson identifies several events that he argues constitute prosecutorial misconduct.

-26-

First, during a relatively heated redirect examination of the State's hostile witness, Wortham, the prosecutor referred to defense counsel by her first name, "Barbara." The trial court immediately called a sidebar. After the sidebar, the prosecutor apologized for "getting a little too comfortable in here. Apologize for using first names." While we agree with Jefferson (and apparently the trial court) that referring to defense counsel by her first name was improper, Jefferson did not show that there was a substantial likelihood that this statement affected the jury's verdict.

Second, Jefferson asserts that the State made several speaking objections during the trial. For example, during Jefferson's recross-examination of Officer Roberts, the prosecutor objected that defense counsel was testifying. With the jury absent, Jefferson argued that this objection was a personal attack on his defense counsel and a comment on Jefferson's right to counsel. Jefferson moved for a mistrial and requested a curative instruction. The court denied the mistrial motion and the request for a curative instruction because "[defense] counsel[] read[] way more into the statement than is warranted."

The Rules of Evidence neither authorize nor prohibit speaking objections. 5 WASH. PRAC., EVIDENCE LAW AND PRACTICE § 103.8 (6th ed.). Instead, the trial court decides the propriety of a speaking objections. This trial court ruled that the State's objection was not improper. Jefferson has not demonstrated that any speaking objections were improper or prejudicial.

Third, Jefferson asserts that it was misconduct for the prosecutor to ask the trial court to admonish one of the members of the gallery. As previously discussed, the record reflects that the proceedings at times were contentious. On three occasions,

during the three-week trial, outside the presence of the jury, the prosecutor reported that he felt he was being questioned about his race, called names, and harassed by Jefferson's father—a member of the gallery. Jefferson has not demonstrated that the prosecutor's requests for an admonition were either misconduct nor prejudicial.[10]

Finally, Jefferson asserts that the State impugned defense counsel when, during the State's closing argument rebuttal, the prosecutor argued that Jefferson's counsel agreed that Jefferson was running with his hand outstretched. Again, Jefferson has not demonstrated that the State's argument impugned defense counsel, Lindsay, 180 Wn.2d at 431-32, or that the argument was prejudicial.

The trial court did not abuse its discretion when it denied Jefferson's motion for a mistrial based on alleged prosecutorial misconduct.

VII

Jefferson next contends that there was insufficient evidence from which a rational juror could find Jefferson guilty of attempted first degree murder and unlawful possession of a firearm. We disagree.

"When reviewing a challenge to the sufficiency of the evidence, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Further, "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Hosier, 157 Wn.2d at 8. Circumstantial evidence is not

---

[10] In his brief, Jefferson asserts that the most contentious of the events—the one that resulted in Jefferson's father being temporarily removed from the courtroom for contempt—occurred in front of the jury. This is incorrect. See RP (5/12/15) at 667-672 (colloquy); at 673 (jury present).

to be considered any less reliable than direct evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

A.   Attempted First Degree Murder

A person commits the crime of first degree murder when, with premeditated intent to cause the death of another person, he causes the death of such person. RCW 9A.32.030(1)(a). Premeditation is "the deliberate formation of and reflection upon the intent to take a human life" and involves "the mental process of deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Condon, 182 Wn.2d 307, 315, 343 P.3d 357 (2015) (internal quotations omitted). Premeditation must involve "more than a moment of time." Condon, 182 Wn.2d at 315.

To convict of an attempted crime, the State must prove both intent to commit the crime and a substantial step toward its commission. RCW 9A.32.020(1). "In order for conduct to comprise a substantial step, it must be strongly corroborative of a defendant's criminal purpose." State v. Price, 103 Wn. App. 845, 852, 14 P.3d 841 (2000).

A person commits first degree attempted murder when, with premeditated intent to cause the death of another, he takes a substantial step toward commission of the act. State v. Smith, 115 Wn.2d 775, 782, 801 P.2d 975 (1990). The act of deliberately firing a gun toward an intended victim is strongly corroborative of an attempt to commit first degree murder. Price, 103 Wn. App. at 852-53.

Here, there was sufficient evidence from which a rational jury could find Jefferson guilty of attempted first degree murder beyond a reasonable doubt. Viewed in the light most favorable to the State, the Union 76 station's surveillance footage shows the

-29-

confrontation at the station, a man witnesses previously identified as Jefferson walk to the car that he arrived in, open the trunk from the driver's side, walk to the trunk, search through the trunk, pull out a small dark object, handle it, and run toward Robinson with his arm outstretched ahead of him. While the weapon was never recovered, the surveillance footage was played for the jury. The jury also had a series of time stamped freeze frame images showing the events.

State v. Price is instructive. In Price, the court upheld a conviction for attempted first degree murder based on evidence that the defendant deliberately fired a gun at the victim's car. Price, 103 Wn. App. at 853. The Price court explained that "the act of deliberately firing a gun toward an intended victim clearly is 'strongly corroborative' of an attempt to commit first degree murder." Price, 103 Wn. App. at 853 (quoting State v. Vangerpen, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)).

B.      Unlawful Possession of a Firearm

To support a charge of first degree unlawful possession of a firearm, the State must prove beyond a reasonable doubt that the defendant was previously convicted in Washington of a serious offense and had a firearm in his possession or control. See RCW 9.41.040(1)(a). Possession of a firearm can mean actual possession or constructive possession. State v. Manion, 173 Wn. App. 610, 634, 295 P.3d 270 (2013). Actual possession means that the person charged with possession had "personal custody" or "actual physical possession" of the firearm. Manion, 173 Wn. App. at 634 (internal quotations omitted). Actual possession may be proved by circumstantial evidence. Manion, 173 Wn. App. at 634.

Jefferson argues that the evidence to support this charge was insufficient because "[n]o witness saw Jefferson in possessi[on] of a gun." This argument fails.

Here, there was sufficient evidence from which a rational jury could find Jefferson guilty of unlawful possession of a firearm in the first degree. First, Jefferson stipulated to a previous "serious offense as that term is defined in RCW 9.41." Second, although a weapon was not recovered, there are (at least) three pieces of circumstantial evidence that support a conclusion that Jefferson actually possessed a firearm: (1) Wortham identified Jefferson as the shooter, (2) Exhibit 105 shows Jefferson pointing a handgun-shaped object at Robinson, and (3) Robinson sustained gunshot wounds. Sufficient circumstantial evidence supports the jury's finding that Jefferson was armed with a firearm at the time of the crime.

## VIII

Jefferson argues next that the "to convict" jury instruction for attempted first degree murder omitted an essential element of the crime by failing to include a premeditation element. We disagree.

Whether a jury instruction correctly states the applicable law is a legal question subject to de novo review. State v. Becklin, 163 Wn.2d 519, 525, 182 P.3d 944 (2008). A "to convict" jury instruction "must contain all the elements of the crime because it serves as a 'yardstick' by which the jury measures the evidence to determine guilt or innocence." State v. Smith, 131 Wn.2d 258, 263, 930 P.3d 917 (1997); State v. DeRyke, 149 Wn.2d 906, 910, 73 P.2d 1000 (2003).

"An attempt crime contains two elements: intent to commit a specific crime and taking a substantial step toward the commission of that crime." DeRyke, 149 Wn.2d at

910. Here, the "to convict" instruction informed the jury that in order to convict Jefferson of attempted first degree murder, the State had to prove that he committed an act that "was a substantial step toward the commission of Murder in the First Degree," and that the act was done "with the intent to commit Murder in the First Degree." Additional jury instructions accurately set forth the elements of murder in the first degree, including premeditation, and defined "premeditation," "intent," and "substantial step."

The court's instructions follow WPIC 100.02 and its "note on use" which recommends a "to convict" instruction setting forth the essential elements of the attempted crime and a separate instruction delineating the elements of the substantive crime.[11] This approach was approved by our Supreme Court in DeRyke, where it rejected the defendant's claim that the "to convict" instruction for attempted first degree rape was deficient because it failed to include all of the elements of first degree rape. DeRyke, 149 Wn.2d at 911. Subsequently, in State v. Reed, 150 Wn. App. 761, 772, 208 P.3d 1274 (2009), this court rejected the argument Jefferson makes here. Reed held that the "to convict" instruction, identical to the instruction given here, correctly set forth the elements of attempted first degree murder and did not relieve the State of its burden to prove all elements of the charged crime. 150 Wn. App. at 772-73. See also State v. Embry, 171 Wn. App. 714, 757-58, 287 P.3d 648 (2012).

The "to convict" instruction provided to the jury correctly set forth all essential elements of the crime of attempted first degree murder.

---

[11] 11A WASH. PRAC., PATTERN JURY INSTR. CRIM. WPIC 100.02 (4th Ed. 2016).

IX

Jefferson next contends that his trial counsel was ineffective because she displayed unprofessional behavior. We disagree.

To prevail on an ineffective assistance of counsel claim, a criminal defendant must demonstrate (1) deficient performance by counsel and (2) resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish deficient performance, the defendant must show that trial counsel's performance fell "below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Courts presume counsel's representation was effective. Strickland, 466 U.S. at 689. This presumption is rebutted if there is no possible tactical explanation for counsel's action. In re Pers. Restraint of Cross, 180 Wn.2d 664, 694, 327 P.3d 660 (2014). Whether an attorney renders ineffective assistance of counsel when he or she violates the Rules of Professional Conduct is a question of law. State v. Garrett, 124 Wn.2d 504, 517, 881 P.2d 185 (1994).

In Garrett, the defendant claimed he was deprived of effective assistance of counsel due to his attorney's unprofessional conduct throughout the trial. Garrett, 124 Wn.2d at 517-518. Our Supreme Court agreed that defense counsel's conduct, throughout the trial, was "boorish, contemptuous, discourteous, disrespectful, insolent, obdurate, obnoxious, offensive, rude and uncouth." Garrett 124 Wn.2d at 522. Indeed, the Court referred the matter to the Washington State Bar Association for appropriate disciplinary investigation and proceedings. Garrett 124 Wn.2d at 522. However, despite defense counsel's unprofessional conduct toward the trial court, our Supreme Court denied defendant's claim for ineffective assistance. The court explained:

> However, with a few minor exceptions, the verbal exchanges between defense counsel and the court occurred out of the presence of the jury. It cannot be said that Respondent was prejudiced in his right to a fair trial based on matters that were not brought to the attention of the jury.

Garrett 124 Wn.2d at 523.

The trial court here admonished Jefferson's counsel numerous times throughout the trial. For example, the trial judge informed defense counsel that he was considering reporting her to the WSBA over her communications with the State's hostile witness Wortham. The court also admonished Jefferson's counsel for her lack of candor to the court and opposing counsel regarding the evidence reviewed by the defense forensic expert Sweeney. Although we agree with the trial court that Jefferson's counsel behaved unprofessionally, Jefferson's claim of ineffective assistance of counsel fails. Defense counsel's conduct in no way rose to the level of misconduct described in Garrett. Moreover, like in Garrett, the trial court's admonishment of defense counsel took place outside the presence of the jury.

Accordingly, Jefferson cannot establish a claim for ineffective assistance of counsel. Defense counsel zealously and aggressively represented Jefferson throughout the trial. The entire record demonstrates that Jefferson did have effective assistance of counsel and was not prejudiced in his right to a fair and impartial trial.

X

Finally, Jefferson claims that cumulative errors at trial denied him his right to a fair trial. We disagree.

Under the cumulative error doctrine a court may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant a right to

a fair trial, even if each error standing alone would be harmless. <u>State v. Venegas</u>, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). "But the doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." <u>Venegas</u>, 155 Wn. App. at 520.

Here, Jefferson cannot establish a claim for cumulative error because there were not multiple and separate errors that denied him a right to a fair trial.

Jefferson's conviction is affirmed.

Mann, J.

WE CONCUR:

Trickey, ACJ

Leach, J.