
FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 0 1 2018
Fairhurst CQ.
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Nov. 1, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TYREE WILLIAM JEFFERSON,<br><br>Petitioner. | NO. 94853-4<br><br>EN BANC<br><br>Filed NOV 0 1 2018 |

GORDON McCLOUD, J.—Tyree Jefferson was convicted of attempted murder in the first degree, assault in the first degree, and unlawful possession of a firearm in the first degree following a jury trial. He challenges the State's use of a peremptory strike against the only African-American juror (Juror 10) on the jury venire, arguing that the strike was exercised in a racially discriminatory manner in violation of *Batson v. Kentucky*.[1] Additionally, Jefferson challenges the current *Batson* test; he argues that it fails to adequately address racial discrimination in jury selection.

---

[1] 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

We hold that the trial court sustainably ruled that there was no purposeful discrimination in the peremptory strike of Juror 10 under *Batson*.

However, "our *Batson* protections are not robust enough to effectively combat racial discrimination during jury selection."[2] In fact, the *Batson* framework "make[s] it very difficult for defendants to prove discrimination even where it almost certainly exists."[3] We need to do better to achieve the objectives of protecting litigants' rights to equal protection of the laws[4] and jurors' rights to participate in jury service free from racial discrimination.[5] For those reasons, we now modify our three-step *Batson* test by replacing *Batson*'s current inquiry at step three with a new inquiry. If a *Batson* challenge to a peremptory strike of a juror proceeds to that third step of *Batson*'s three-part inquiry, then the trial court must ask whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike. If so, then the strike must be denied and the challenge to that strike must be accepted.

We apply this new standard today and find that race could have been a factor in Juror 10's dismissal. We therefore reverse and remand.

---

[2] *City of Seattle v. Erickson*, 188 Wn.2d 721, 723, 398 P.3d 1124 (2017).

[3] *State v. Saintcalle*, 178 Wn.2d 34, 46, 309 P.3d 326 (2013) (plurality opinion).

[4] *Batson*, 476 U.S. at 89.

[5] *Powers v. Ohio*, 499 U.S. 400, 406-07, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

FACTS

On February 14, 2013, Jefferson was involved in a fight over a pair of designer sunglasses. The fight ended with the shooting of Rosendo Robinson. Jefferson was subsequently charged with attempted murder in the first degree, assault in the first degree, and unlawful possession of a firearm in the first degree. Clerk's Papers (CP) at 40-42. His defense was that someone else pulled the trigger. 11 Verbatim Report of Proceedings (VRP) (May 19, 2015) at 1282-84.

Voir dire began on May 4, 2015. 2 VRP (May 4, 2015) at 106. On the second day of voir dire, the State exercised a peremptory strike against Juror 10, the last African-American in the jury pool. 3 VRP (May 5, 2015) at 238. Jefferson challenged this strike with a *Batson* motion. *Id.* After going through the three-step *Batson* analysis, the trial court denied the *Batson* motion and ruled that the State had provided a nondiscriminatory explanation for its peremptory challenge of Juror 10. *Id.* at 239-47. The trial proceeded; it lasted approximately 10 days.

The jury convicted Jefferson of attempted murder in the first degree, assault in the first degree, and unlawful possession of a firearm in the first degree. 13 VRP (May 20, 2015) at 11-13. The court entered judgment on the attempted murder and unlawful possession of a firearm convictions only. Jefferson was sentenced to 337.5 months of incarceration. CP at 409.

Jefferson appealed, and the Court of Appeals affirmed the convictions. *State v. Jefferson*, 199 Wn. App. 772, 784, 401 P.3d 805 (2017), *review granted*, 189 Wn.2d 1038, 409 P.3d 1052 (2018).

Jefferson then petitioned for review on three issues: (1) whether the trial court erred in denying the *Batson* motion to deny the State's peremptory strike of Juror 10 under the current *Batson* test, (2) whether this court should revisit the *Batson* test, and (3) whether the trial court erred in denying Jefferson's motion for mistrial. We granted review.

## ANALYSIS

1.  The trial court's ruling that the State did not violate *Batson* by exercising purposeful racial discrimination in jury selection was not clearly erroneous

During Jefferson's trial, the State used a peremptory strike against the only remaining African-American member of the venire. 3 VRP (May 5, 2015) at 238. The State provided three reasons for the strike: first, that Juror 10 indicated that voir dire was a "waste of time"; second, that Juror 10 had specific knowledge of the movie *12 Angry Men*; and third, that Juror 10 had brought outside evidence into jury deliberations as a juror in a previous trial. Jefferson argues that the State's reasons for striking Juror 10 were pretextual and that the trial court should have granted Jefferson's *Batson* challenge. *Id.* at 242-45.

Washington cases apply the three-part *Batson* test to determine whether a peremptory strike was impermissibly racially motivated. This test replaced the "'crippling burden of proof'" previously required under *Swain v. Alabama*[6] when attempting to prove a racially motivated strike. *State v. Saintcalle*, 178 Wn.2d 34, 43-44, 309 P.3d 326 (2013) (plurality opinion) (quoting *Batson*, 476 U.S. at 92-93). Under *Batson*, the defendant must first establish a prima facie case that "gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94 (citing *Washington v. Davis*, 426 U.S. 229, 239-42, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976)). As of 2017, in Washington, this first step of the *Batson* test also includes a bright-line rule that the trial court *must* recognize a prima facie case of discriminatory purpose when a party strikes the last member of a racially cognizable group. *Erickson*, 188 Wn.2d at 734. Second, "the burden shifts to the State to come forward with a [race-]neutral explanation for [the challenge] . . . ." *Batson*, 476 U.S. at 97. If the State meets its burden at step two, then third, "the trial court then [has] the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

We review *Batson* challenges for clear error and defer to the trial court to the extent that its rulings are factual. *Saintcalle*, 178 Wn.2d at 41 (citing *State v. Hicks*,

---

[6] 380 U.S. 202, 223-24, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by Batson*, 476 U.S. 79.

163 Wn.2d 477, 486, 181 P.3d 831 (2008) (quoting *State v. Luvene*, 127 Wn.2d 690, 699, 903 P.2d 960 (1995) (quoting *Hernandez v. New York*, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)))).

### A. *Jefferson established a prima facie showing of discriminatory purpose*

In the first step of a *Batson* challenge, the challenger—in this case, Jefferson—must establish a prima facie case giving rise to the inference of discriminatory purpose. *Batson*, 476 U.S. at 94.

Juror 10 was the only African-American juror remaining on the venire. 3 VRP (May 5, 2015) at 238. Although Jefferson's trial occurred prior to *Erickson*, the trial court employed an equivalent bright-line rule. *Id.* at 239-41. Under both the trial court's pre-*Erickson* rule and the *Erickson* bright-line rule, "[t]he trial court must [when the sole remaining member of a racially cognizable group has been struck from the jury] then require an explanation from the striking party and analyze, based on the explanation and the totality of the circumstances, whether the strike was racially motivated." *Erickson*, 188 Wn.2d at 734 (citing *Batson*, 476 U.S. at 94; *Saintcalle*, 178 Wn.2d at 42). Thus, even though this trial occurred before *Erickson* was decided, the trial court determined that the defense made a prima facie showing of purposeful discrimination. 3 VRP (May 5, 2015) at 241.

*B. The State provided a race-neutral justification for its use of a peremptory strike*

After concluding that Jefferson established a prima facie case, the trial court gave the State an opportunity to explain its use of the peremptory strike. The State argued, "[I]n this instance, each of the jurors that I struck so far, in this case, I went through the same identical analysis. Each of them I have asked to stand, and I asked them questions." *Id.* The State then listed several reasons for the peremptory strike. First, when asked about the utility of voir dire, Juror 10 stated, "No, I don't think you should waste time. . . . Well, I mean that's up to you, but for me, personally, it's a waste of time . . . ." 2 VRP (May 4, 2015) at 176. Second, the State expressed concern with Juror 10's response to defense counsel's question about *12 Angry Men*, stating, "[Juror 10] seemed to be very enthusiastic about the movie." 3 VRP (May 5, 2015) at 244. Third, according to the State, Juror 10's responses to the defense counsel's voir dire indicated that in a prior jury service stint, Juror 10 had "[brought] in things that were irrelevant to the case." *Id.* at 244-45. Thus, the State provided a race-neutral explanation for its peremptory strike.

*C. The trial court analyzed the State's reasons for the peremptory strike and found no purposeful discrimination*

The trial court then took the third step of a *Batson* analysis and analyzed the State's reasons for the peremptory strike. It concluded that the State's reasons sufficed and denied the *Batson* motion:

7

There are legitimate non-discriminatory reasons, that are not race based, why Mr. Curtis wants to strike No. 10, notwithstanding the fact that they are both African-American men; the fact that he didn't bond with him; he didn't feel comfortable with him in terms of his earlier responses; the issue about *12 Angry Men* and his familiarity with the movie . . . . And I don't, in essence, I don't believe that the state has— that the defense has shown that that, in some—in any way is pretext or a cover for race-based strike, so I'm going to deny the motion.

3 VRP (May 5, 2015) at 246-47.

> *D. Under the current* Batson *test, which requires proof of purposeful discrimination to invalidate a peremptory strike and deference to the trial court's findings on this factual matter, Jefferson fails to prove clear error*

While each justification provided for the strike seems reasonable when viewed separately, as a whole Juror 10's responses were not that different from those provided by the jurors who eventually sat on the jury panel. Additionally, the type of voir dire faced by Juror 10 was substantially different from that of the other jurors. However, under *Batson*, the only question for this court is whether the trial court's factual finding that these differences did not prove purposeful discrimination was clearly erroneous. As discussed below, we conclude that the trial court's ruling on this issue was not clearly erroneous under the current *Batson* test.

> i.    Juror 10's responses were not that different from other jurors' responses

First, when the State asked Juror 10 about the importance of the voir dire, the prosecutor used different and more questions with Juror 10 as compared with the

other potential jurors. The State asked three jurors about whether conducting voir

dire is a "waste of time." For Jurors 23 and 25, the State initially framed this question

as, "if you were my client," whereas for Juror 10, the prosecutor began with the more

abstract "[is it] enough that everybody stood up and took the oath?" 2 VRP (May 4,

2015) at 175-77. Then, when the State did ask Juror 10 for his perspective "if I was

representing you," Juror 10 conveyed a response similar to the responses given by

other jurors, stating:

> Just like you said, if everyone took the oath and you're expecting them
> to be partial to the evidence and everything that's presented, so—and
> the questions that have been asked about, you know, being influenced
> by anything from the outside, still need to separate those two from the
> facts and then—and whatever they hear on the outside.

*Id.* at 176. Here, Juror 10 seems to agree with the State, acknowledging that the State

needs to assess the impact of outside influence on jurors. Juror 10's answer is similar

to the answers given by Jurors 23 and 25; they both said that the parties need voir

dire to assess biases and ensure fairness. *Id.* at 175-77. Jurors 23 and 25 were not

subject to peremptory strikes; they sat on the jury panel.

Second, Juror 10's responses to defense counsel's *12 Angry Men* questions

were fairly similar to the responses of some of the other jurors. Juror 10 responded:

> I know it's a long time ago. I think Jack-somebody played in the movie
> "12 Angry Men." The way it started out, a lot of jurors were ready to
> give a verdict right off the bat because a lot of them had things to do,
> places to go, other things going on in their life. And like the young man,
> No. 9, said, 11 of them wanted to go ahead and give a verdict, but that

9

12th man held out because he knew that the evidence, what he was listening to didn't add up. And like he said, it took days a jury room, and it took some time to get those jurors to understand the facts that were given in court. And I say one by one, the jurors began to change [their] mind and see the evidence a little bit different than what they had started out to.

In the end, if I can remember right, the person that was on trial didn't do it. It was someone else.

*Id.* at 196.

This response from Juror 10 was somewhat similar to that of Juror 9, whom the prosecutor also peremptorily struck due to his response to the *12 Angry Men* discussion. 3 VRP (May 5, 2015) at 243. Juror 9 stated,

I watched it. I think—the main point I took out of it was that 11 people were against—or were for the guilty verdict. Only one person was for not guilty. And slowly, throughout the movie, he kind of convinces them, gives that reasonable doubt in their head, and so it just kind of showed the power of the system at work. It's not because—people had all these assumptions, and it slowly starts to reveal biases in their heads that they didn't realize. So at the end, they all kind of change their mind and realize how even themselves, they couldn't trust their own opinion.

2 VRP (May 4, 2015) at 195.

But Juror 9 responded to the question before Juror 10. In fact, Juror 9's description of the film seems to have sparked Juror 10's memory, because Juror 10 credits Juror 9's description in his own summary. Additionally, Juror 9's description emphasizes the one juror's ability to "convince" the rest of the jurors, whereas Juror 10's description seems to emphasize process and the importance of not "giv[ing] a

verdict right off the bat."

Juror 10's summary actually appears more similar to that of Juror 23, who stated,

> Oh, boy. That's putting me to the test. As far as I can remember, it's a jury comes together, and you have very differing opinions, and they can't come to a conclusion, if I remember correctly. It's very difficult to come to a conclusion that they can all agree on the same verdict.

*Id.* at 194. In context, Juror 10's response to the *12 Angry Men* question was more detailed, perhaps because three jurors had already discussed the film. But its content was not substantially different from Juror 23's content. Juror 23 was not subject to a peremptory strike; as discussed above, Juror 23 sat on the jury.

Finally, the prosecutor's reliance on Juror 10's propensity to bring outside evidence into the jury room lacks support in the record. The defense asked Jurors 2 and 10 about their prior jury service. 3 VRP (May 5, 2015) at 228-29. Juror 2, the subject of one of defense counsel's peremptory strikes, stated, "[I s]olved the case, yes." *Id.* at 228. In response, the defense counsel asked Juror 2 some questions on this topic:

> [Defense]: Without telling us the verdict, during deliberations, did you have a situation where anybody referred to matters that were not germane to what you were considering?
> Juror No. 2: Sure.
> [Defense]: And what happened when that happened?
> Juror No. 2: We all discussed it, and the person agreed that it didn't really pertain to what was going on.

11

[Defense]: Okay. Was that person called on that, essentially, and saying, this doesn't have anything to do with it?

Juror No. 2: Exactly.

[Defense]: Juror No. 10

Juror No. 10: Yes.

[Defense]: And that worked?

Juror No. 10: I agree with No. 2. I did have that same situation because I was one of them.

[Defense]: You were one of them that brought up stuff?

Juror No. 10: Yeah. I was too open-minded, I guess.

[Defense]: Okay. All right.

*Id.* at 228-29. The Court of Appeals, agreeing with the State, ruled that here Juror 10 "admitted that he previously brought extraneous evidence into the deliberations while serving as a juror in a criminal trial." *Jefferson*, 199 Wn. App. at 784.

But the record fails to support this conclusion. Prior to this specific exchange, defense counsel was discussing the various human experiences every person brings to jury deliberations and, in that context, the fact that jurors might sometimes raise matters "not germane" to the case. 3 VRP (May 5, 2015) at 225-28. Juror 10 did not admit to bringing up extrinsic evidence, but instead to having discussed a matter he now realized was "not germane." It is unfair to characterize Juror 10's response as an admission that he brought "extraneous evidence"[7] into the deliberations.

---

[7] *Jefferson*, 199 Wn. App. at 784; Br. of Resp't at 15.

      ii.     Juror 10 faced a different sort of voir dire from that faced by other jurors

Additionally, the prosecutor singled out Juror 10 in his questioning. Near the end of one of the prosecutor's voir dire segments, the court informed the State that it had two minutes left. The State then ended its inquiry by stating, "Okay. I'm not going to start another subject, so I'm going to sit down at this time. I know Juror No. 10 is smiling. He's like, yeah." 2 VRP (May 4, 2015) at 186.

The prosecutor was not talking to Juror 10 immediately before this exchange. Instead, the prosecutor had been leading up to a question about personal or political beliefs about firearms. But he never returned to this question, so it is impossible to predict what Juror 10's response might have been. There was seemingly no reason (at least from the record) for the State to call out Juror 10's reaction (whether or not there even was a reaction) at this point.

      iii.     Under the current *Batson* test, the only question is whether this shows purposeful race discrimination and the trial court did not err in ruling that the answer was no

Based on this record, it is impossible to say with certainty that the prosecution's reasons for its peremptory strike of Juror 10 were based on purposeful race discrimination. The prosecutor's decision to "call out" Juror 10, along with the prosecutor's disparate response to Juror 10's answers when compared to other

jurors' answers, certainly suggests that his proffered reasons for dismissing Juror 10, Section 1.B, were a pretext for intentional race discrimination.[8]

But under *Batson*, the question for us is whether that is the only possible conclusion that can be drawn from this record—or, more specifically, whether the trial court's conclusion that this did not amount to purposeful race discrimination was clearly erroneous. Based on this record, the answer is no.

2.  Our current *Batson* test does not sufficiently address the issue of race discrimination in juror selection

*A. History of* Batson*'s evolution, federal and state*

Since 1879, the United States Supreme Court has recognized that race discrimination in the selection of jurors violates the Fourteenth Amendment's equal protection guarantee. *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 309-10, 25 L. Ed. 664 (1880); U.S. CONST. amend. XIV. Despite this acknowledgment, both the

---

[8] As the Court of Appeals noted, the State's briefing on appeal emphasized that the trial court's judgment should be upheld because "(1) the case was being tried before an African American judge, (2) the prosecutor was African American . . . , (3) the defendant was African American, and (4) the defense attorney was a Caucasian woman. . . . Thus, in essence, the defense attorney's objection amounted to this: the African American prosecutor chose this particular case to attempt to engage in purposeful race discrimination against an African American venire member." Br. of Resp't at 14. The Court of Appeals correctly ruled that "[t]he State's argument lacks merit . . . ." *Jefferson*, 199 Wn. App. at 785. It assumes that implicit racial bias can affect only "a Caucasian['s]" perceptions and decisions, but not an "African American['s]." Research, however, shows that assumption is incorrect. *E.g.*, Devon W. Carbado & L. Song Richardson, *The Black Police: Policing Our Own*, 131 HARV. L. REV. 1979, 1993-2002, 2005-11, 2017-19 (2018).

United States Supreme Court and our court have struggled to find an adequate solution.

In 1965, the United States Supreme Court held that purposeful race discrimination in the use of peremptory challenges violates the equal protection clause. *Swain*, 380 U.S. at 223-24. But it defined this constitutional protection very narrowly. Even though not a single African-American had ever been placed on a jury in a criminal trial in the county, the *Swain* Court stated, "There is no allegation or explanation . . . as to when, why and under what circumstances in cases previous to this one the prosecutor used his strikes . . . ." *Id.* at 226. The Court then concluded that despite the fact that the county had a record of eliminating all potential African-American jurors, there was still insufficient evidence of systematic discrimination to violate the Constitution. *Id.* at 226-27.

The *Batson* Court rejected *Swain*'s "crippling burden of proof," 476 U.S. at 92, and replaced it with a three-part test for scrutinizing peremptory challenges to determine whether they violated the equal protection clause. *Batson*, 476 U.S. at 96-97. Its three steps are the ones discussed in Part 1. Acknowledging the various jury selection processes throughout the country, the Court left implementation of this test to the state and federal courts. *Id.* at 99 n.24.

Looking back over the last 50 years, it is clear that *Batson* has failed to eliminate race discrimination in jury selection. *Miller-El v. Dretke*, 545 U.S. 231,

270, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (Breyer, J., concurring) ("[T]he use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before.") As we stated in *Saintcalle*, there is a growing body of evidence showing that *Batson* has done very little to make juries more diverse or to prevent prosecutors from exercising race-based challenges. 178 Wn.2d at 44-49.

Our case law has reviewed the history and failures of *Batson* in depth. *E.g.*, *Saintcalle*, 178 Wn.2d at 43. And we have "long discussed a change to the *Batson* framework," *Erickson*, 188 Wn.2d at 734, to address these remaining problems.

In *Hicks*, we stated that the trial court was "well within [its] discretion" to say that *Batson*'s first step—the prima facie showing of discrimination—was satisfied when the sole black jury member was struck. 163 Wn.2d at 491. But, in *State v. Rhone*, we declined to adopt a bright-line rule that striking the sole remaining member of a particular racial group always constitutes a per se prima facie showing of discrimination.[9] 168 Wn.2d 645, 653, 229 P.3d 752 (2010) (plurality opinion).

In 2013, this court decided *Saintcalle*. 178 Wn.2d 34. Because neither party included proposals for a new *Batson* framework in its briefing, we declined to adopt

---

[9] In *State v. Meredith*, this court clarified that *Rhone* did not adopt the bright-line rule, but such a rule could be adopted in the future, once five justices agreed. 178 Wn.2d 180, 184, 306 P.3d 942 (2013).

16

one. *Id.* at 55. We did, however, acknowledge the need for a new *Batson* framework

that

> do[es] more than simply acknowledge that unconscious bias is a permissible consideration in the *Batson* analysis. It should seek to eliminate this bias altogether or at least move us closer to that goal. *A new framework should give trial courts the necessary latitude to weed out unconscious bias where it exists, without fear of reversal and without the need to level harsh accusations against attorneys or parties.*"

*Id.* at 54 (emphasis added).

In 2017, we took another step. We adopted the bright-line rule—previously

discussed by *Hicks*, *Rhone*, *Meredith*,[10] and *Saintcalle*—that trial courts must

recognize a prima facie case of discriminatory purpose in violation of *Batson* and

the equal protection clause when the sole remaining member of a racially cognizable

group is struck from the jury with a peremptory challenge. *Erickson*, 188 Wn.2d at

732. But we did not go beyond that bright-line rule, which applies at step one of the

*Batson* framework. Specifically, we did not address the ongoing concerns of

unconscious bias expressed in *Meredith* or the best way to approach *Batson*'s third

step. *See Meredith*, 178 Wn.2d at 192 (Chambers, J., dissenting); *Saintcalle*, 178

Wn.2d at 46 (lead opinion), 87 (Gonzalez, J., concurring).

We do so now.

---

[10] *State v. Meredith*, 178 Wn.2d 180, 306 P.3d 942 (2013).

*B. This court has previously outlined* Batson*'s deficiencies and has the discretion to alter the* Batson *framework*

The *Batson* Court anticipated that state procedures would vary to accommodate unique jury selection processes. 476 U.S. at 99 n.24; *Saintcalle*, 178 Wn.2d at 51. This court agrees; we have held that we have "great discretion to amend or replace the *Batson* requirements if circumstances so require." *Erickson*, 188 Wn.2d at 727 (citing *Saintcalle*, 178 Wn.2d at 51). In fact, as we stated in *Saintcalle*, this court can modify *Batson* using its authority under federal law to create new procedures within existing Fourteenth Amendment frameworks. *Saintcalle*, 178 Wn.2d at 51 (citing *Smith v. Robbins*, 528 U.S. 259, 273, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (discussing the Court's "established practice, rooted in federalism, of allowing the States wide discretion, subject to the minimum requirements of the Fourteenth Amendment, to experiment with solutions to difficult problems of policy")).

In addition, as the *Saintcalle* plurality and Justice Pro Tem. Chambers' dissent both stated, our court has inherent authority to adopt such procedures to further the administration of justice. 178 Wn.2d at 51, 119.

We have already identified *Batson*'s main deficiencies: (1) *Batson* makes "'it very difficult for defendants to prove [purposeful] discrimination even where it

18

almost certainly exists'"[11] and (2) *Batson* fails to address peremptory strikes due to implicit or unconscious bias, as opposed to purposeful race discrimination.[12] The result of applying *Batson* in this case confirms these deficiencies. As a prophylactic measure to ensure a robust equal protection guaranty, we must now adopt a new framework for the third part of the *Batson* challenge.

      i.     United States Supreme Court decisions do not cure these two problems

The State argues that no change in the *Batson* approach is necessary because the third step of *Batson* has already been refined by post-*Batson* United States Supreme Court decisions. Br. of Resp't at 7-11 (quoting *Foster v. Chatman*, __ U.S. __, 136 S. Ct. 1737, 1748, 195 L. Ed. 2d 1 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008)), 1754 (quoting *Miller-El*, 545 U.S. at 241, *Snyder*, 552 U.S. at 478)).

Those decisions do provide some refinements. But they provide no guidance on how to evaluate juror responses to determine "purposeful discrimination." And they did not address the issue of "unintentional, institutional, or unconscious" race bias. *Saintcalle*, 178 Wn.2d at 36 ("*Batson* recognizes only 'purposeful

---

[11] *Erickson*, 188 Wn.2d at 735 (quoting *Saintcalle*, 178 Wn.2d at 46).

[12] *Saintcalle*, 178 Wn.2d at 54.

19

discrimination,' whereas racism is often unintentional, institutional, or unconscious.").

>        ii.    GR 37 does address these two problems, but it does not apply retroactively to the voir dire in this case

This court adopted GR 37 in order to address these problems with the *Batson* test. But Jefferson's trial, voir dire, and *Batson* challenge all occurred before GR 37 was effective. The question is whether GR 37 nevertheless applies to this case. This is a long analysis, but the answer is no.

GR 37 was adopted on April 5, 2018. The order adopting the new rule stated that it was to become effective "upon publication." Order in the Matter of the Proposed New Rule General Rule 37—Jury Selection, No. 25700-A-1221 (Order re GR 37) (Wash. Apr. 5, 2018). In its second supplemental brief, the State argues that despite the order's language making it effective "upon publication," GR 9(i)(4) actually makes GR 37 effective on September 1, 2018. Second Suppl. Br. of Resp't, at 2-4.

GR 9(i)(4) describes the procedures for a rule-making cycle. It states, "Proposed rules published in January and adopted by the Supreme Court shall be republished in July and shall take effect the following September 1." Under ordinary circumstances, the State's analysis of when a rule becomes effective would be correct.

GR 37, however, went through a different process. The American Civil Liberties Union of Washington (ACLU) submitted suggested GR 37, which was then labeled as GR 36, for consideration in 2015. PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT 1 (undated) (FINAL REPORT), http://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Or derNo25700-A-1221Workgroup.pdf. We then published the proposed rule for comment in November 2016. Order No. 25700-A-1159 (Wash. Nov. 2, 2016). The comment period ended April 30, 2017. *Id.* During the comment period, both the Washington Association of Prosecuting Attorneys and the ACLU submitted alternative rules; we received twenty-eight additional comments from various organizations and individuals. Comments for GR 37—Jury Selection, https://www.courts.wa.gov/court_rules/?fa=court_rules.commentDisplay&ruleId= 537. This court then formed a work group to determine whether a consensus could be reached on a rule. Letter from Mary Fairhurst, Chief Justice, to proposed work group members (July 17, 2017) (on file with court). The work group submitted a new proposed GR 37 recommendation in its February 2018 final report. FINAL REPORT app. 1.

On April 5, 2018, we issued an order adopting the bulk of the work group's proposed GR 37. The order stated that the "new rule will be published in the Washington Reports and will become effective upon publication." Order re GR 37.

21

GR 37 was published in the official advance sheets of the Washington Reports on April 24, 2018. 190 Wn.2d 1146-48. It states, "By orders dated April 5, 2018, the Supreme Court made the following changes to the Rules of Court, effective April 24, 2018." *Id.*

GR 37's journey differed substantially from the regular schedule for rule making and adoption in GR 9(i). For rules enacted under GR 9(i)'s regular schedule for review and adoption of rules, the order accompanying an adopted rule or rule amendment states, "[The rule] will be published in the Washington Reports and will become effective September 1, 2018." *See, e.g.*, In re Proposed Amend. to RAP 10.2, Order No. 25700-A-1215 (Wash. Dec. 6, 2017) ; In re Proposed Amends. to RPC 1.0A, Order No. 25700-A-1211 (Wash. Dec. 6, 2017). But the text of the GR 37 order clearly states that it will become effective "upon publication." Thus, this court did not rely on GR 9(i) for the effective date. Instead, we used our authority under GR 9(j)(1) to adopt a rule "without following the procedures set forth in [GR 9]." Therefore, GR 37 became effective April 24, 2018, and remains effective now, while Jefferson's case is pending before us on direct appeal.

Because GR 37 is effective during Jefferson's direct appeal, we must turn to the potentially applicable rules concerning whether GR 37 must govern our current assessment of the sufficiency of the pre-GR 37 jury selection procedures that occurred far earlier in this case.

First, we have the rule of prospective application, which states that statutes generally apply prospectively from their effective date unless a contrary intent is indicated. *State v. Humphrey*, 139 Wn.2d 53, 55, 983 P.2d 1118 (1999). Such rules of statutory interpretation also apply to court rules like GR 37. *State v. Robinson*, 153 Wn.2d 689, 692, 107 P.3d 90 (2005). Thus, GR 37 would ordinarily apply prospectively from its effective date unless a contrary intent was expressed. No contrary intent was expressed. In fact, as discussed above, the order adopting GR 37 explicitly states that it "will become effective upon publication." Order re GR 37. This weighs in favor of applying GR 37 prospectively to voir dires occurring after its effective date. But it does not tell us very clearly whether GR 37 should also apply prospectively—meaning today—as this court considers the sufficiency of the voir dire and the *Batson* challenge that occurred earlier in this case.

Another rule must also be considered to figure that out: the rule that a newly enacted statute or court rule generally applies to all cases pending on direct appeal and not yet final. *Landgraf v. USI Film Products*, 511 U.S. 244, 275, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994); *State v. Pillatos*, 159 Wn.2d 459, 470, 150 P.3d 1130 (2007); *State v. Blank*, 131 Wn.2d 230, 248, 930 P.2d 1213 (1997). Jefferson's case is before us on direct appeal and is not yet final.

But such a newly enacted statute or court rule will only be applied to proceedings that occurred far earlier in the case if the "triggering event" to which

23

the new enactment might apply has not yet occurred. *Pillatos*, 159 Wn.2d at 471 ("[W]e consider a statute to be retroactive if the 'triggering event' for its application happened before the effective date of the statute." (citing *State v. Belgarde*, 119 Wn.2d 711, 722, 837 P.2d 599 (1992) (quoting *Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n*, 83 Wn.2d 523, 535, 520 P.2d 162 (1974)))); *Blank*, 131 Wn.2d at 248 ("'A statute operates prospectively when the precipitating event for [its] application . . . occurs after the effective date of the statute . . . .'" (alterations in original) (quoting *Aetna Life Ins. Co.*, 83 Wn.2d at 535)).

What is the "triggering event" in this case that will determine whether applying GR 37 would be permissibly prospective, or impermissibly retrospective? The question this court asks to determine whether a new statute or new court rule would be operating prospectively or retroactively if applied on appeal to preexisting events is

> "whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event."

*In re Pers. Restraint of Flint*, 174 Wn.2d 539, 548, 277 P.3d 657 (2012) (quoting *Pillatos*, 159 Wn.2d at 471 (quoting *Landgraf*, 511 U.S. at 269-70)).

24

This is not a completely scientific inquiry. But we generally hold that when the new statute concerns a postjudgment matter like the sentence or revocation of release, or a prejudgment matter that has not yet occurred because of the interlocutory nature of the appeal, then the triggering event is not a "past event" but a future event. In such a case, the new statute or court rule will apply to the sentence or sentence revocation while the case is pending on direct appeal, even though the charged acts have already occurred.[13] In contrast, where the new statute concerns a problem with the charging document but the trial and conviction are over, then the triggering event is over—so the new statute does not apply on appeal to that past event. *Pillatos*, 159 Wn.2d at 471.

In this case, the jury selection and the *Batson* challenge both occurred before GR 37 became effective. The new rule does not change the elements of the crime or anything about punishment, so it does not attach new legal consequences to past acts of the defendant. On the other hand, the new rule implicates substantial

---

[13] *See, e.g., Flint*, 174 Wn.2d at 548 ("[A] law is not retroactive merely because some of the requisites for its application "'are drawn from a time antecedent to its passage'""; application of new community supervision revocation statute to previously convicted defendant constitutes prospective, not retrospective, application (quoting *Belgarde*, 119 Wn.2d at 722 (quoting *State v. Scheffel*, 82 Wn.2d 872, 879, 514 P.2d 1052 (1973)))); *Blank*, 131 Wn.2d at 249 ("[T]he precipitating event for application of the [legal/financial obligation] statute is termination of the appeal and affirmance of a defendant's conviction, despite the fact that this event had its origin in a situation existing prior to enactment of the statute.").

constitutional rights. The answer to whether the "triggering event" has already occurred or not is, therefore, not crystal clear.

We conclude that the voir dire and the *Batson* challenge in this case are more similar to the charging instrument problem in *Pillatos*[14] (which implicated the constitutional right to a jury determination on every element charged) than to the supervision and sentencing problems in the *Blank* and *Flint* cases. And in *Pillatos*, we held that the new statute could not be applied to the previously filed charging instrument to which the defendant had already pleaded guilty. 159 Wn.2d at 480.

Thus, in the context of a *Batson* challenge, the precipitating event is the voir dire itself. Therefore, although Jefferson's case is still on direct appeal, the rule that new statutes and court rules apply to all cases not yet final and still pending on direct appeal does not allow us to apply GR 37 to change the consequences of the completed voir dire in this case.

There is one final consideration: we construe remedial and curative statutes to operate not just prospectively, but also retrospectively. *Pillatos*, 159 Wn.2d at 473; *Macumber v. Shafer*, 96 Wn.2d 568, 570, 637 P.2d 645 (1981) ("An exception is recognized, however, if a statute is remedial in nature and retroactive application

---

[14] There were four defendants at different stages of their criminal proceedings in *Pillatos*. Jefferson's position is most similar to that of Pillatos and Butters, not Base and Metcalf. *Pillatos*, 159 Wn.2d at 470-75.

26

would further its remedial purpose." (citing *Agency Budget Corp. v. Wash. Ins. Guar. Ass'n*, 93 Wn.2d 416, 495, 610 P.2d 361 (1980))). A statute is remedial when "it relates to practice, procedure, or remedies and does not affect a substantive or vested right." *Miebach v. Colasurdo*, 102 Wn.2d 170, 181, 685 P.2d 1074 (1984) (citing *Johnston v. Beneficial Mgmt. Corp. of Am.*, 85 Wn.2d 637, 641, 538 P.2d 510 (1975)). We have defined a "right" as a "'legal consequence deriving from certain facts,'" while a "remedy" is a "'procedure prescribed by law to enforce a right.'" *State v. McClendon*, 131 Wn.2d 853, 861, 935 P.2d 1334 (1997) (quoting *Dep't of Ret. Sys. v. Kralman*, 73 Wn. App. 25, 33, 867 P.2d 643 (1994)). GR 37 prescribes juror selection procedures and is therefore partly remedial; but, it also affects substantial constitutional rights and is therefore partly substantive. Thus, this final interpretive rule also weighs against applying GR 37 to the completed voir dire in this case.

Adhering to our prior decisions in *Pillatos*, *Blank*, and *Flint*, we hold that GR 37 applies prospectively to all trials occurring after GR 37's April 24, 2018 effective date. But because the "triggering event" for its application was voir dire, we cannot apply GR 37 to the completed *Batson* challenge in this case.

iii.    The current *Batson* test must be modified in order to prevent discrimination in jury selection

We therefore address the problems with step three of the *Batson* test directly. In order to meet the goals of *Batson*, we must modify the current test. Using our authority as discussed in *Erickson*, 188 Wn.2d at 733, and *Saintcalle*, 178 Wn.2d at 51, we hold that the question at the third step of the *Batson* framework is *not* whether the proponent of the peremptory strike is acting out of purposeful discrimination. Instead, the relevant question is whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." If so, then the peremptory strike shall be denied.

As in *Erickson*, we apply this new test directly to this case. We do so because, just as in *Erickson*, "[t]his alteration [would] not change the basis for a *Batson* challenge. The evil of racial discrimination is still the evil this rule seeks to eradicate. Rather, this alteration provides parties and courts with a new tool, allowing them an alternate route to defend the protections espoused by *Batson*." 188 Wn.2d at 734.

Whether "an objective observer could view race as a factor in the use of the peremptory challenge" is an objective inquiry. It is not a question of fact about whether a party intentionally used "purposeful discrimination," as step three of the prior *Batson* test was. It is an objective inquiry based on the average reasonable person—defined here as a person who is aware of the history of explicit race

28

discrimination in America and aware of how that impacts our current decision making in nonexplicit, or implicit, unstated, ways. For that reason, we stand in the same position as does the trial court, and we review the record and the trial court's conclusions on this third *Batson* step de novo.[15] This is a change from *Batson*'s deferential, "clearly erroneous" standard of review of the purely factual conclusion about "purposeful discrimination."

Applying de novo review here, as discussed in Section 1.C above, race could be viewed as a factor in the peremptory strike of Juror 10. The prosecutor said he struck Juror 10 because he had brought extraneous evidence—"things that were irrelevant to the case"—into prior jury deliberations. 3 VRP (May 5, 2015) at 245. But that is not what Juror 10 said. Juror 10 said only that he realized, in retrospect, that he had discussed matters that were not germane. The prosecutor also said that he struck Juror 10 because his responses to questions about the voir dire process and *12 Angry Men* were so different from the responses of other jurors who went on to

---

[15] *See United States v. Grant*, 696 F.3d 780, 785 (8th Cir. 2012) ("The objective standard, which turns on a reasonable person's belief about the surrounding circumstances, calls for a 'legal characterization that must be reviewed de novo.'" (quoting *United States v. McKines*, 933 F.2d 1412, 1426 (8th Cir. 1991) (en banc))); *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (holding that an objective custody determination under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is reviewed de novo); *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017) (stating that ineffective assistance of counsel claims are reviewed de novo and require performance that falls "below an objective standard of reasonableness"); *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002) (holding that when the trial court denies a self-defense instruction based on an objective assessment, the standard of review is de novo).

sit on the jury. But as discussed in Section 1.D, the record does not support that characterization. In addition, the prosecutor essentially called out Juror 10 with a sarcastic comment for no apparent reason. Taken together, these proffered, racially neutral reasons for striking Juror 10 seem to lack support in the record. They reflect differential treatment of the sole African-American juror, and hence, they "could" support an inference of implicit bias.

Additionally, while not specifically offered as a reason for the peremptory strike by the State, the trial court's analysis offered "the fact that [the State] didn't bond with [Juror 10]" as a reason for dismissal. *Id.* at 246. In his *Batson* concurrence, Justice Marshall expressed his concern about such nebulous justifications, stating:

> A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported.

*Batson*, 476 U.S. at 106. In *Saintcalle*, we also recognized the pervasive force of unconscious bias, stating, "[P]eople are rarely aware of the actual reasons for their discrimination and will genuinely believe the race-neutral reason they create to mask it." 178 Wn.2d at 49.

Finally, and of importance in this case, we have recognized that such bias is not necessarily limited to interracial incidents. Intraracial discrimination, both

explicit and implicit, exists as well. *State v. Barber*, 118 Wn.2d 335, 348, 823 P.2d 1068 (1992); *see* Devon W. Carbado & L. Song Richardson, *The Black Police: Policing Our Own*, 131 HARV. L. REV. 1979, 1991-95 (2018). Without a more specific record about why the prosecutor did not "bond" with a juror, this vague assertion cannot serve as a valid, race-neutral justification for a peremptory strike.

We reverse and remand for a new trial.[16] *See Erickson*, 188 Wn.2d at 735.

CONCLUSION

The Court of Appeals correctly held that the trial court's decision to deny the *Batson* challenge was not clearly erroneous.

But our current *Batson* standard fails to adequately address the pervasive problem of race discrimination in jury selection. Based on the history of inadequate protections against race discrimination under the current standard and our own authority to strengthen those protections, we hold that step three of the *Batson* inquiry must change: at step three, trial courts must ask if an objective observer could view race as a factor in the use of the peremptory challenge. In this case, an objective observer could view race as a factor in the peremptory strike of Juror 10.

We therefore reverse and remand for a new trial.

---

[16] Given our resolution of this *Batson* issue, we do not reach the issue of the trial court's decision to deny the motion for a mistrial.

31

González, J.

WE CONCUR:

Fairhurst, C.J.

Wiggins, J.

Owens, J.

No. 94853-4

YU, J. (concurring) — I concur with the lead opinion's conclusion that our current *Batson* framework fails to adequately address the pervasive problem of racial discrimination in jury selection. Lead opinion at 31; *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). And I supported the adoption of GR 37, a rule intended to address commonly held, but entirely incorrect, assumptions that the life experiences of people of color negatively affect their ability to be fair and impartial jurors. However, while I applaud the rule's intent and sincere efforts to apply it, no court rule can overcome the intellectual gymnastics and assumptions required to isolate implicit bias in jury selection. GR 37 is thus an unsatisfying, partial solution to a severe, intractable problem.

I concur with the lead opinion's analysis in this case, but I nevertheless remain convinced that nothing short of complete abolishment of the peremptory challenge, coupled with further development of our "for cause" challenge jurisprudence, will get us on the right path toward finally eradicating racial bias in

jury selection. *City of Seattle v. Erickson*, 188 Wn.2d 721, 739-41, 398 P.3d 1124

(2017) (Yu, J., concurring); *see also State v. Saintcalle*, 178 Wn.2d 34, 69-118,

309 P.3d 326 (2013) (González, J., concurring). We just need to say no to

removing jurors based on a hunch.

I respectfully concur.

Yu, J.

González, J.

94853-4

MADSEN, J. (concurring/dissenting)—I agree with the lead opinion that Juror 10's dismissal was racially motivated. I also agree that, in general, *Batson v. Kentucky*, 476 U.S 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), has not been adequate in combating race discrimination in jury selection. However, I write separately because the lead opinion essentially adopts GR 37 into our *Batson* framework, which is unnecessary and inappropriate. Indeed, GR 37 was never meant to be a constitutional rule backed by constitutional protections.

Under *Batson*, a criminal defendant is denied equal protection when members of the jury pool are struck on the basis of racial discrimination. 476 U.S. at 85 ("Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure."). While a juror may be excluded if unfit, "[a] person's race simply 'is unrelated to his fitness as a juror.'" *Id.* at 87 (quoting *Thiel v. S. Pac. Co.*, 328 U.S. 217, 227, 66 S. Ct. 984, 90 L. Ed. 1181 (1946)). Thus, "the State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause." *Id.* at 89.

Three elements must be met in order to succeed in bringing a *Batson* challenge. First, the defendant must establish a prima facie case of purposeful discrimination. *Id.* at 96. We have previously held that "the trial court must recognize a prima facie case of discriminatory purpose when the sole member of a racially cognizable group has been struck from the jury." *City of Seattle v. Erickson*, 188 Wn.2d 721, 734, 398 P.3d 1124 (2017). If the first step is satisfied, the burden shifts to the prosecutor who must establish an adequate and race-neutral justification for striking the juror. *Id.* at 726-27. While the *Batson* Court did not require the same inquiry as is required in a for-cause challenge, the "race neutral" reason must be assessed against the constitutional protection and the inquiry should be close to a for-cause challenge in that the reasons must go to juror qualifications. *Batson*, 476 U.S. at 87 ("[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial"). For example, the notion that a black juror will be more sympathetic to the defendant or that black jurors do not possess the sufficient "'intelligence, experience, or moral integrity'" is not a "race-neutral" reason. *Id.* at 105 (Marshall, J., concurring) (quoting *Neal v. Delaware*, 103 U.S. (13 Otto) 370, 397, 26 L. Ed. 567 (1881)). Finally, if the prosecutor provides a race-neutral justification, "the court must weigh all relevant circumstances and decide if the strike was motived by racial animus." *Erickson*, 188 Wn.2d. at 727. Purposeful discrimination may be established in various ways. For example, the court will find purposeful discrimination if the "prosecutor's reasons for striking a black prospective juror apply equally to an otherwise

2

similar nonblack prospective juror who is allowed to serve."[1] *Foster v. Chatman*, ___

U.S. ___, 136 S. Ct. 1737, 1742, 195 L. Ed. 2d 1 (2016).

The lead opinion's primary contention is that the third element in the *Batson*

framework is too stringent and makes it difficult for defendants to prove many, even

obvious, instances of discrimination. The court, cognizant of *Batson*'s shortcomings,

enacted GR 37, which states,

> (c) Objection. A party may object to the use of a peremptory challenge to raise the issue of improper bias. The court may also raise this objection on its own. The objection shall be made by simple citation to this rule, and any further discussion shall be conducted outside the presence of the panel. The objection must be made before the potential juror is excused, unless new information is discovered.
>
> . . . .
>
> (e) Determination. The court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. *If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied.* The court need not find purposeful discrimination to deny the peremptory challenge. The court should explain its ruling on the record.

190 Wn.2d 1146-47 (2018) (emphasis added) (boldface omitted).

Unlike *Batson*'s proof of racial motivation requirement, GR 37 offers broader

protection—denying peremptory challenges where "an objective observer could view

race or ethnicity as a factor." However, GR 37, as the lead opinion correctly held, does

---

[1] Because the trial court is in the best position to assess any purposeful discrimination against a juror, we will not disturb the trial court's ruling on a *Batson* challenge unless the record demonstrates the denial was clearly erroneous. *See State v. Hicks*, 163 Wn.2d 477, 494, 181 P.3d 831 (2008); *State v. Saintcalle*, 178 Wn.2d 34, 56, 309 P.3d 326 (2013) (plurality opinion).

not apply here. Specifically, GR 37 does not apply because it became effective after the "triggering event," voir dire and the *Batson* challenge in this case, and does not apply retroactively.

Still, rather than apply our traditional *Batson* framework, the lead opinion creates a new constitutional rule in place of the third element:

> If a *Batson* challenge to a peremptory strike of a juror proceeds to that third step of *Batson*'s three-part inquiry, then the trial court must ask whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike. If so, then the strike must be denied and the challenge to that strike must be accepted.

Lead opinion at 2. Confusingly, while the lead opinion concedes that GR 37 does not apply here, its new element is a carbon copy of the rule. In effect, the lead opinion is applying GR 37 under a new guise. If this court intended to back GR 37 with constitutional protections, it would not have promulgated the requirements of GR 37 under our court rules. Indeed, unlike a constitutional violation under *Batson*, the text of GR 37 includes no remedy for noncompliance. The lead opinion's attempt to incorporate GR 37 into our *Batson* framework is unfounded and renders GR 37 superfluous.

At any rate, the facts of this case demonstrate a peremptory strike based on racial motivation. Here, the prosecutor pointed to three comments made by Juror 10 during voir dire as justification for his dismissal.

First, the prosecutor explained that he was troubled by the fact that Juror 10 said the prosecutor's questions were a "waste of time." In that interaction, the prosecutor began his final 20 minutes of questioning by specifically asking Juror 10:

4

> Why am I still here with 20 minutes to question you? Why does the Court allow that? ... You think I should continue to ask questions and take advantage of the time, or do you think it's enough that everybody stood up and took the oath?

2 Verbatim Report of Proceedings (VRP) (May 4, 2015) at 175-76. In response, Juror 10 said that for him, personally, the additional questions were a waste of time, and he didn't think that the prosecutor should waste any time. *Id.* at 176. The prosecutor specifically addressed these questions to Juror 10. Targeting Juror 10 with this question is some evidence that the prosecutor was inviting the sort of answer he received. The lead opinion correctly explains that despite stating that a prosecutor should not waste time, Juror 10's answer was generally similar to the answers given by Jurors 23 and 25, both of whom were not struck from the jury. What's more, the question was addressed differently to Juror 10 than to Jurors 23 and 25. Juror 10 was initially asked vaguely and abstractly whether the prosecutor should continue to use up all of his allotted time. Alternatively, Jurors 23 and 25 were asked whether they would want their lawyer to take up the allotted time if they were the defendant.

The second reason the prosecutor gives for dismissing Juror 10 is that he was too enthusiastic about the movie *12 Angry Men*. According to the prosecutor, Juror 10 was struck because when asked about the movie by defense counsel, "he seemed very enthusiastic about the movie." 3 VRP (May 5, 2015) at 244. While Jurors 1, 9, and 23 also said they have seen the movie and gave a brief synopsis, the prosecutor was apparently troubled only by Juror 10 because he had a stronger recollection of the movie. This is not a sufficient race-neutral reason and is merely a pretext for discrimination.

5

Excluding Juror 10 because he is familiar with *12 Angry Men* may not be overtly race based, but it does suggests that the prosecutor had a "gut feeling" that Juror 10 would be too sympathetic to the defendant. While other jurors were familiar with the movie, it is telling that the prosecutor was most concerned with Juror 10. Of course, Juror 10's familiarity with any movie has nothing to do with his fitness as a juror. Indeed, it appears the prosecutor was likely concerned that Juror 10 would be sympathetic to a member of his own race and would attempt to sway the other jury members in favor of the defendant.

Finally, the prosecutor explained that he was troubled by the fact that Juror 10 had served on a prior jury and admitted that he considered matters that were not germane to deliberations. Specifically, Juror 10 said he "was too open-minded." 3 VRP (May 5, 2015) at 229. It is unclear what Juror 10 meant by his remark about being "too open-minded." A juror is permitted to bring life experience and knowledge into the jury deliberation room. Indeed, the prosecutor did not seem troubled by the fact that Juror 11, when asked how he determines credibility, said:

> Life experience, people I've dealt with—I'm 65 years old, and I been
> basically out on my own since I got drafted at age 19. So I been able to
> interact with different people. I worked for 32 years in the fire department,
> interacted with a lot of Asian, Hispanic, African-American. So I take all
> that information I've got over the years and try to make the best judgment
> that I can. I mean—and some of the—I guarantee you, it's not gonna be
> the best because I'm maybe a little prejudiced toward one age group
> because I don't trust anybody under 30, or I trust more people my age.

2 VRP (May 4, 2015) at 180. It is difficult to understand why the prosecutor seemed troubled by Juror 10's statements, but not Juror 11's. Juror 11 blatantly admitted he

would rely on his prejudices to assess credibility. Once again, it appears that the prosecutor was scrutinizing Juror 10 more closely than the rest of the jury pool. This raises concerns as to the prosecutor's subjective beliefs. Specifically, the prosecutor did not seem to be concerned generally about issues not germane to the case being brought into deliberations. Instead, it appears the prosecutor was worried about the type of information that Juror 10, as an "open-minded" black man, would bring into deliberations. Of course, perceived viewpoints and stereotypes based on race are not race-neutral justifications for exclusion.

Because I would conclude that GR 37 does not apply in this case and that Juror 10's dismissal constituted racial discrimination under our traditional *Batson* framework, I respectfully dissent.

94853-4
Madsen, J., concurring/dissenting

Madsen, J.

Johnson, J.

Stephens, J.

8