IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86360-6-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| CRISTIAN ALEXANDER QUIJAS, | |
| Appellant. | |

SMITH, J. — In October 2017, the State charged Christian Quijas with murder in the second degree after Quijas shot and killed Angel Estrada. The State filed a motion requesting juvenile court decline jurisdiction. The court granted the State's motion and transferred Quijas's case to superior court where he would be tried as an adult. Quijas then pleaded guilty.

On direct appeal, this court affirmed the juvenile court's decline order, but remanded for the trial court to consider Quijas's claim that the discretionary decline statute is racially biased as applied. The trial court held a Dillenburg[1] hearing, where Quijas appeared shackled, and found that, while disproportionality exists in the entire juvenile justice system and the discretionary decline process, Quijas did not prove the statute is racially biased as applied or that his individual case was tainted by bias. Quijas appealed once again, reiterating his arguments from below and claiming his Dillenburg hearing was

---

[1] Dillenburg v. Maxwell, 70 Wn.2d 331, 413 P.2d 940 (1966).

also tainted by bias. Finding no error in the trial court's ruling and that bias did not taint Quijas's *Dillenburg* hearing, we affirm.

FACTS

Background

Christian Quijas was 15 years old when he was charged with murder in the second degree.[2] Quijas was living in Burlington with his mother, Marcia Thompson. Quijas was a member of a local gang, the Surenos (Southsiders), which had a rivalry with another gang, the Nortenos (Northsiders). Quijas's sister, C.Q., was dating Angel Estrada, a member of the Nortenos. Quijas, as well as other members of the Surenos, took issue with C.Q. dating Estrada.

In March 2017, C.Q. and Estrada drove to Thompson's home to drop off C.Q.'s child so Thompson could babysit. Estrada waited in the car while C.Q. went inside. Quijas was at the home with Daniel Gracidas, another member of the Surenos. Quijas attempted to go outside and confront Estrada, but Thompson restrained him. C.Q. returned to the vehicle and began to drive away with Estrada. Quijas and Gracidas ran out of the home and chased after the car. C.Q. was aware that Gracidas had given Quijas a handgun earlier that day.

C.Q. pulled the car over when Estrada attempted to exit the vehicle. Estrada and Quijas began a physical altercation, during which C.Q. heard Quijas call Estrada a "fucking buster."[3] During the fight, Quijas pulled out the handgun

---

[2] The facts concerning Quijas' initial trial and appeal come from this court's published opinion in *State v. Quijas*, No. 78591-5-I (Wash. Ct. App. Feb. 18, 2020), https://www.courts.wa.gov/opinions/pdf/785915.pdf.

[3] "Buster" is a slang term for a rival gang member.

and shot Estrada five times, three of those shots were fired after Estrada fell to the ground. Quijas and Gracidas fled the scene and were arrested soon thereafter.

The State charged Quijas with second degree murder and moved for the juvenile court to decline jurisdiction. The court held a five-day declination hearing where it considered testimony from various witnesses, including the defense's expert psychologist. The court declined jurisdiction. In its ruling, the court did not address Quijas's claim that Latinx youth are declined and tried in adult court at a rate disproportionate to their percentage of the population. Quijas pleaded guilty and the court sentenced him to 180 months confinement. Quijas appealed the court's discretionary decline decision.

On appeal, this court affirmed the trial court's declination ruling, but held the trial court erred by not addressing Quijas's claim of racial bias. We remanded with instructions to conduct a *Dillenburg*[4] hearing to consider Quijas's claim of racial bias and determine whether declination was appropriate.

In advance of the *Dillenburg* hearing, the State requested Quijas be restrained during the proceeding. At the hearing, Quijas orally opposed restraints. The court heard arguments from both sides and granted the State's motion to have Quijas restrained.

---

[4] A *Dillenburg* hearing determines whether declination of juvenile court jurisdiction is proper. *See In re Pers. Restraint Petition of Dalluge*, 152 Wn.2d 772, 782, 100 P.3d 279 (2004).

During the *Dillenburg* hearing, in addition to hearing from both parties, the court heard testimony from Dr. Heather Evans, a psychologist retained by Quijas, who prepared a report (hereafter referred to as the "Evans Report") concerning the relationship between race and discretionary decline. The court issued its findings of fact and conclusions of law in February 2024 and held continued declination of juvenile court jurisdiction was "in the best interests of the respondent and the public." While the court recognized the Evans Report reached the conclusion that Hispanic youth are overrepresented in discretionary decline hearings, it noted that the report did not "speak to why there are disproportionate outcomes," nor did it analyze individual cases. Because neither the report nor Evans's testimony provided "any information on what aspects of the criminal justice system create a disproportionality that indicates there is bias in this declination hearing or process," the court concluded sufficient evidence did not exist to support a finding of racial bias in Washington's discretionary decline process. The court affirmed its previous findings on the *Kent*[5] factors and found decline was still in the best interest of Quijas and the public. Quijas appealed.

## AMICUS CURIAE

Under RAP 10.6, "the appellate court may on motion grant permission to file an amicus curiae brief only if all parties consent, or if the filing of the brief would assist the appellate court."

---

[5] *Kent v. United States,* 383 U.S. 554, 566-567, 86 S. Ct. 1045 (1966).

Here, the ACLU of Washington, King County Department of Public Defense, and TeamChild submitted an amicus curiae brief in support of Quijas's appeal. The brief summarizes the findings from the Evan's Report and asks this court to adopt the objective observer standard into the discretionary decline process. Because the briefing does not provide anything particularly dissimilar for consideration, and the Evan's Report is sufficiently summarized in the parties' briefs, we decline to consider the amicus brief.

ANALYSIS

Washington's Discretionary Decline Statute

Quijas contends the administration of Washington's discretionary decline statute violates due process because it is administered in an arbitrary and racially biased manner. The State claims Quijas conflates disproportionality and disparity, and the process is not unconstitutional. We agree with the State.

We review constitutional challenges de novo. *City of Seattle v. Evans*, 184 Wn.2d 856, 861, 366 P.3d 906 (2015). Statutes are presumed constitutional, and the burden is on the challenger to show unconstitutionality. *Evans*, 184 Wn.2d at 862. When a party challenges the administration of a statute in a specific context, rather than the statute as whole, it is an "as-applied" challenge. *Evans*, 184 Wn.2d at 862. If a statute is unconstitutional as applied, it "does not invalidate the statute but prohibits its application in that specific context and future similar contexts." *State v. Ross*, 28 Wn. App. 2d 644, 646, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026 (2024).

5

Due process requires an individual be afforded " 'constitutionally adequate procedures' " before they can be deprived of certain substantive rights, including life, liberty, and property. *State v. Watkins*, 191 Wn.2d 530, 537, 423 P.3d 830 (2018) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)). Constitutionally adequate procedures include the "right to a fair trial by an impartial judge." *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010). "Impartial means the absence of actual or apparent bias." *Swenson*, 158 Wn. App. at 818. Judges are presumed to act without bias or prejudice, and a claim of bias will only succeed where evidence of actual or potential bias exists. *Swenson*, 158 Wn. App. at 818.

Generally, the juvenile court has exclusive original jurisdiction over cases where a youth commits a crime. RCW 13.04.030. In limited circumstances, determined by the youth's age and the crime committed, the adult court will have original jurisdiction. RCW 13.04.030. This is known as "automatic decline." *See Dalluge*, 152 Wn.2d at 780-81. When the juvenile court has jurisdiction, it may have the discretion to decline original jurisdiction and transfer the youth to adult court. RCW 13.40.110. To determine whether discretionary decline is appropriate, the court must hold a declination hearing. RCW 13.40.110. Discretionary decline is only appropriate when it would be "in the best interest of the juvenile or the public." RCW 13.40.110. In making this determination, the court considers eight factors, known as the *Kent* factors, related to the offense and the child. *Kent,* 383 U.S. at 566-567.

Here, Quijas relies mainly on the Evans Report to assert Washington's discretionary decline procedure is administered in a racially biased manner. While the Evans Report does show racial disproportionality in the discretionary decline system, it does not provide an explanation for what mechanisms produce the disparate outcomes. Additionally, the sample size is comparably small and the report fails to consider relevant factors that may affect the data.

First, the overall sample for the Evans Report is relatively small.[6] The data includes information on 24,689 unique children under the age of 18 charged with a crime from July 26, 2009 to June 30, 2019. From that group, only 1.2 percent (249 individuals) were discretionarily declined to adult court.[7] This means all data in the Evans Report concerning racial disproportionality in discretionary decline is based on only 1.2 percent of the total population of youth charged with a crime. Among the total population of youth charged with a crime, decline is rare for eligible children of every race.

Despite discretionary decline being comparatively rare among convicted youth, the State does admit the Evans Report shows that children of color were more likely to be tried as adults during the time studied. But, the report does not opine as to why this discrepancy occurs. Quijas contends the report controlled for "legitimate variables, such as criminal history and type of offense," and these variables do not explain the patterns; therefore, race must be a determinative

---

[6] We recognize each number represents a child and, while the numbers may be statistically insignificant, the children are not.

[7] Of the 24,689 individuals, 97 percent were sentenced as juveniles and 2 percent (495) were transferred to adult court through "auto decline."

factor. While the report does control for criminal history and type of offense, these factors are far from a complete list of possible explanations, and the factors themselves are not analyzed in a robust manner.

The Evans Report controlled for criminal history by calculating the mean number of prior convictions, but criminal history is more complex than simply counting convictions. The report also controlled for type of offense but, again, even within the categories Evans assigns, there is variance. For example, one category of "type of offense" was "felony homicide." But there are multiple ways to commit felony homicide and they vary greatly in the seriousness of the offense (e.g., premeditated intent versus negligence). As the trial court correctly noted, "The Evans report is missing factors or consideration of the facts of individual cases and does not give adequate consideration to the different types of charges or legislative changes as they affect juvenile decline." Without a more thorough analysis, it cannot be concluded these two factors did not have an impact on discretionary decline within the data set.

Quijas compares the Evans Report to the Beckett Report in *State v. Gregory*, 192 Wn.2d 1, 12-14, 427 P.3d 621 (2018), but the Beckett Report is distinguishable. In *Gregory*, the Supreme Court held, "[The death penalty] is imposed in an arbitrary and racially biased manner," and it struck down the statute as unconstitutional. 192 Wn.2d at 35. The Court relied heavily on the Beckett Report. *Id.* at 19. The Beckett Report concluded, "[B]lack defendants were four and a half times more likely to be sentenced to death than similarly

situated white defendants." *Id.* at 12. Unlike the Evans Report, the Beckett Report analyzed each case and coded for numerous variables.[8] Additionally, the data only analyzed defendants who had committed the same exact offense—aggravated murder. *Id.* at 12, 19. The Beckett Report's rigorous methodology and comprehensive analysis differentiates it from the Evans Report.

Because the Evans Report is limited in its analysis and does not speak to why there are disproportionate outcomes for juveniles in discretionary decline proceedings, it is not sufficient evidence of bias, either explicit or implied, in the declination process. Accordingly, we conclude Quijas cannot show the discretionary decline process is applied in a racially biased manner, violating due process.

<u>Quijas's Declination and *Dillenburg* Hearing</u>

Quijas contends that, even if the discretionary decline process is not administered in a racially biased manner, his individual case was tainted by bias. He claims the court erred in determining bias did not influence its decision at the original declination hearing as well as the *Dillenburg* hearing. We conclude the trial court did not err when it held bias did not impact Quijas's declination hearing, and we conclude bias did not affect Quijas's *Dillenburg* hearing.

---

[8] "The Beckett Report coded each case as to whether the defendant had victimized multiple people as opposed to just one; whether the defendant had caused the victim(s) prolonged suffering; how many aggravating circumstances the State had determined existed; how many aggravators the jury had found existed; the demographics of the defendants' victims; whether the defendant had pleaded guilty; and whether the case had garnered significant publicity."

1. <u>Standard of Review</u>

Quijas contends we should apply the "objective observer" standard to determine whether race was a factor in his decline hearing and *Dillenburg* hearing. Under the objective observer standard, "the relevant question is whether 'an objective observer could view race or ethnicity as a factor.' " *State v. Zamora*, 199 Wn.2d 698, 718, 512 P.3d 512 (2022) (internal quotation marks omitted) (quoting *State v. Jefferson*, 192 Wn.2d 225, 249, 429 P.3d 467 (2018)). An objective observer is an " 'average reasonable person . . . who is aware of the history of explicit race discrimination in America and aware of how that impacts our current decision-making in nonexplicit, or implicit, unstated, ways.' " *Zamora*, 199 Wn.2d at 718 (quoting *Jefferson*, 192 Wn.2d at 249-50). This standard has been used in criminal cases with regard to juror misconduct, juror selection, and prosecutorial misconduct, but the standard has never been applied to declination hearings. *See Zamora*, 199 Wn.2d at 717-18 (discussing cases using the objective observer standard).

Here, the proper standard of review is abuse of discretion. We are reviewing whether the court's determinations were improperly influenced by bias. Therefore, our question is whether the court's decision was based on " 'untenable or manifestly unreasonable' " grounds. *State v. M.A.*, 106 Wn. App. 493, 498, 23 P.3d 508 (2001) (quoting *State v. Toomey*, 38 Wn. App. 831, 834, 690 P.2d 1175 (1984)). If the trial court's findings are supported by substantial

10

evidence, they will be accepted as verities on appeal. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

2. Declination Hearing

Quijas claims his declination hearing was tainted by bias because the State's references to gang activity invoked negative stereotypes about Latinx youth, and the court relied on Quijas's gang affiliation when assessing the *Kent* factors. While both the State and the court discussed gang-related behavior, it was not used as a proxy for race; it was a relevant factual component of the case.

"Evidence of gang affiliation is considered prejudicial." *State v. Jefferson*, 199 Wn. App. 772, 798, 401 P.3d 805 (2017), *rev'd on other grounds*, 192 Wn.2d 225, 429 P.3d 467 (2018). Gang-related evidence cannot be admitted to prove the defendant committed the crime with which they were charged, but it can be admitted for other purposes, such as motive and circumstances of the crime. *Jefferson*, 199 Wn. App. at 798; *see also State v. Yarbrough*, 151 Wn. App. 66, 85, 210 P.3d 1029, 1039 (2009) (finding gang-related evidence relevant to establish the relationship between the defendant and victim). Before gang-related evidence is admitted, the court must find a nexus between the gang activity and the crime. *Jefferson*, 199 Wn.2d at 798.

Here, Quijas contends the use of gang labels in his decline hearing provoked damaging stereotypes and biased the court. Quijas cites to numerous journal articles discussing the dangers of labeling juveniles as gang affiliated, but

11

these articles are largely focused on conflating race with gang membership or applying gang labels when they are not relevant. *See e.g.*, Beth Caldwell, *Reifying Injustice: Using Culturally Specific Tattoos as a Marker of Gang Membership,* 98 WASH. L. REV. 787, 802-04 (2023) (discussing how tattoos are used to mislabel individuals as gang members); Jordan Blair Woods, *Systemic Racial Bias and RICO 's Application to Criminal Street and Prison Gangs*, 17 MICH. J. RACE & L. 303, 337-38 (2012) ("Perhaps the most common representation of Latino youth in popular culture today is as a gang member.").

We agree with Quijas, as does the State, that erroneously labeling someone as a gang member, or mentioning an affiliation to a gang without any nexus to the crime, can be prejudicial, but here, Quijas's gang affiliation was not used as a proxy for race—it was a central component of the crime. Quijas identified as a gang member and had a criminal history consisting of gang-related crimes. Quijas, as well as other members of the Surenos, took issue with his sister dating Estrada, a member of a rival gang. And during the altercation between Quijas and Estrada, Quijas called Estrada a slang term for a rival gang member. There was a direct nexus between Quijas's gang affiliation and the murder charge[9] and, accordingly, it was not improper for either the State or the trial court to reference Quijas's gang membership.

---

[9] In a footnote in his opening brief, Quijas contends evidence exists showing the crime was not gang related. Quijas cites to his own motion opposing decline for this assertion and provides no other evidence this claim is credible.

In addition, the court did not rely on Quijas's gang affiliation in determining to decline jurisdiction. While the court did reference gang involvement in its discussion of some of the *Kent* factors, it was far from the only consideration.[10] On remand, the court reexamined the factors in light of the allegation of bias and found all the facts supporting the factors remained "true and accurate." The court recognized the entire juvenile justice system and declination process may be tainted by implicit bias, but found no evidence of implicit or explicit bias at Quijas's hearing.

Because it is not inherently biased to discuss gang activity during a declination hearing where the crime is gang related, we conclude that the bias did not taint the proceedings and the court did not abuse its discretion when it affirmed Quijas's decline.

### 3. *Dillenburg* Hearing

Quijas claims the State's references to Quijas's gang activity injected bias in the *Dillenburg* hearing and impacted the proceeding. The State claims Quijas did not raise the issue of bias during the hearing, therefore, this court should not consider it on appeal and, even if Quijas can raise the issue on appeal, no evidence exists to support a finding of bias in the proceeding. While Quijas may raise this issue on appeal, we conclude he failed to show the hearing was influenced by bias.

---

[10] As this court found on appeal, the trial court properly considered the *Kent* factors in the declination hearing, and its failure to consider Quijas's claim of bias did "not pertain to any of the *Kent* considerations." *Quijas*, slip op. at 10.

Under RAP 2.5, this court may "refuse to review any claim of error which was not raised in the trial court." The State claims that Quijas waived his right to appeal this issue because he did not raise it at the trial court, but this argument is not persuasive. Quijas contends that bias tainted the entire *Dillenburg* hearing because of the State's repetitive references to gang activity. Though Quijas could have objected to the reference of gang activity at the hearing, his appeal is not based on any one statement made by the State. His argument is that the accumulation of references to gang activity infused racial bias into the proceedings and, therefore, he properly raises it for the first time on appeal.

Similar to his assertions about the declination hearing, Quijas contends the State's references to his gang affiliation tainted the *Dillenburg* hearing. Quijas claims the "State collapsed [his] entire identity into his membership in an ethnic gang and used it as a proxy for race by concluding everyone with that identity is dangerous."

While the State did refer to Quijas's gang affiliation throughout the hearing, it did so only as was relevant to the case. As discussed above, a nexus exists between Quijas's gang affiliation and the crime charged and, accordingly, discussion of Quijas's gang-related activity was not improper. Had gang affiliation not been a factor in Quijas's case, the State's references to gang-related activity would have been indicative of bias. But, here, the case clearly involved gang affiliation and the State's reference to such was not used as a proxy for race or to imply that everyone with such an affiliation is dangerous.

Aside from claiming the State's insertion of gang-related language tainted the proceeding, Quijas does not contend the court's decision itself was biased. Because the court's decision rested on the findings from the Evans Report and the analysis of the *Kent* factors—both discussed in detail above--and explicitly acknowledged the dangers of bias in the declination process, we conclude that bias did not influence the proceeding and the trial court did not abuse its discretion when it found continued declination was in the best interest of the respondent and the public.

Use of Restraints

Quijas contends the court violated his constitutional rights by failing to conduct an individualized inquiry before ordering he be shackled during the *Dillenburg* hearing, and his unjustified shackling biased the trial court's decision. Because the court engaged in an individual inquiry and had adequate reasons to require Quijas shackled, we find no violation of Quijas's constitutional rights occurred.

Generally, this court reviews alleged constitutional violations de novo, but because the decision of whether to shackle a defendant is vested within the discretion of the trial court, we review a trial court's shackling decision for abuse of discretion. *State v. Jackson*, 195 Wn.2d 841, 850, 467 P.3d 97 (2020). A trial court's decision is an abuse of discretion if it is " 'manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.' " *Jackson*, 195 Wn.2d at 850 (internal quotation marks omitted) (quoting *State v. Turner*, 143

Wn.2d 715, 724, 23 P.3d 499 (2001)). A decision is not abuse of discretion merely because we would have ruled differently. *State v. Madden*, 16 Wn. App. 2d 327, 337, 480 P.3d 1154 (2021).

Defendants have a constitutional right to appear in court free from restraints. *Madden*, 16 Wn. App. 2d at 336 (citing WASH. CONST. art. I, § 22; U.S. CONST. amends. VI, XIV). Restraints are disfavored because "they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial." *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981). But the right to appear free from restraints is not absolute and "may yield to courtroom safety, security, and decorum." *State v. Lundstrom*, 6 Wn. App. 2d 388, 394, 429, P.3d 1116 (2018). "Restraints are permissible if necessary to prevent injury to persons in the courtroom, disorderly conduct at trial, or escape." *State v. Walker*, 185 Wn. App. 790, 800, 344 P.3d 227 (2015).

Before ordering a defendant to be shackled, the court must engage in an individualized inquiry. *Lundstrom*, 6 Wn.2d at 394. The court's decision to restrain an individual " 'must be founded upon a factual basis set forth in the record.' " *Walker*, 185 Wn. App. at 800 (quoting *Hartzog*, 96 Wn.2d at 400). If, as here, the proceeding is not in the presence of a jury, a lesser showing is required because the danger of prejudice is not as substantial. *Walker*, 185 Wn. App. at 799. The Supreme Court has identified several factors a court may consider when determinizing if a defendant should be shackled:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Jackson*, 195 Wn.2d at 853 (alteration in original) (internal quotation marks omitted) (quoting *State v. Hutchinson*, 135 Wn.2d 864, 887-88, 959 P.2d 1061 (1998)). Restraints should only be used as a last resort and less restrictive alternatives must be considered before imposing restraints. *State v. Finch*, 137 Wn.2d 792, 850, 975 P.2d 967 (1999).

4. Individualized Inquiry

Quijas claims the trial court applied the wrong analysis when it required him to be shackled at the *Dillenburg* hearing. He contends the State presented no evidence that he had ever tried to escape, he would harm anyone in the courtroom, or he would be disorderly. Accordingly, Quijas claims his shackling was based on theoretical assertions of what could happen and generalized safety concerns, not in response to an individualized determination.

But the court did consider Quijas's particular situation. The court noted the charges involved (murder in the second degree), documented instances of assault and threatening behavior while at Juvenile Rehabilitation Administration facilities and Department of Corrections, and Quijas's involvement in prison riots. While the court did mention Quijas's gang affiliation, it did not base its decision solely on that fact. In addition to this evidence, the State also noted the hearing

17

took place in a courtroom which, unlike a jail courthouse facility, does not have extra officers on hand to assist if an incident were to occur. Also, contrary to Quijas's claim that the court did not consider less restrictive alternatives and physical restraints are a last resort, the court allowed Quijas to wear civilian clothing, required the media to take photos only from the waist up to avoid images of the shackles, and allowed Quijas to have one hand free to take notes. Based on the court considering Quijas's particular circumstances prior to making its decision, it was not an abuse of discretion for the court to approve restraints.

We affirm.

WE CONCUR: